STATE of Wisconsin, Plaintiff-Respondent,

v.

John A. WOOD, Defendant-Appellant.

Supreme Court

*No. 2007AP2767–CR. Oral argument November 3, 2009.*
*—Decided March 19, 2010.*

2010 WI 17

(Also reported in 780 N.W.2d 63.)

324

326

For the defendant-appellant there were briefs by *Kristen E. Lehker* and *Wessel, Lehker & Fumelle Inc.*, Madison, and oral argument by *Kristen E. Lehker.*

For the plaintiff-respondent the cause was argued by *R. Duane Harlow,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

An amicus curiae brief was filed by *Kristin Kerschensteiner* and *Disability Rights Wisconsin,* Madison, and *Michael Balch, James Grohsgal,* New York, N.Y., on behalf of Disability Rights Wisconsin, the National Disability Rights Network, and the Judge David L. Bazelon Center for Mental Health Law, and oral argument by *James Grohsgal.*

¶ 1. N. PATRICK CROOKS, J. This case is before this court on certification from the court of appeals pursuant to Wis. Stat. § (Rule) 809.61 (2005–06).[1] The defendant, John A. Wood (Wood), is committed to the custody of the Department of Health and Family Services (DHFS), after having been found not guilty of a crime by reason of mental disease or defect (hereinafter

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

described as "NGI"). DHFS placed him at Mendota Mental Health Institute (Mendota), where he has been a patient since 1999.

¶ 2. In September 2006, Mendota filed a motion with the La Crosse County Circuit Court seeking an order authorizing it to administer psychotropic medication to Wood without his consent, pursuant to Wis. Stat. § 971.17(3)(c). The circuit court, Judge Michael J. Mulroy presiding, found Wood incompetent to refuse medication and issued the requested order. Wood filed a motion for relief from the circuit court order. The circuit court denied that motion. Wood then appealed the denial of that motion and the order compelling medication to the court of appeals, which certified the following questions to us: Whether Wis. Stat. § 971.17(3)(c), which authorizes the involuntary medication of committed persons who are found NGI of a crime and who are found to be incompetent to refuse treatment or medication, violates due process in two respects: (1) by allowing involuntary medication without a finding of dangerousness and (2) by failing to provide a mechanism for periodic review of the medication order.[2] In addition to the constitutional questions, Wood raises several claims of ineffective assistance of counsel based on his trial attorney's failure to raise the constitutional due process arguments, along with other alleged failings. He asks that the order compelling involuntary medication be vacated.

¶ 3. After this court accepted certification, but before oral argument, the State filed a motion to supplement the record with evidence pertaining to an

---

[2] The court of appeals certified—and we accepted review of—this case based on the issues as Wood raised them on appeal. Accordingly, we focus our analysis on the questions as Wood raised them to us and to the court of appeals.

April 22, 1997, administrative directive (hereinafter described as "AD-11–97" or "the directive"). The directive sets forth the procedure for Mendota staff to follow when assessing whether to seek an order for compelled involuntary medication and treatment and when administering medication and treatment pursuant to such an order. We remanded this case to supplement the record with that evidence, and the La Crosse County Circuit Court, Judge Ramona A. Gonzalez presiding, held a hearing in order to supplement the record in accordance with our remand order. Subsequent to that hearing, Wood submitted a supplemental brief to this court arguing that, to the extent that an internal policy such as AD-11–97 has the force of law, it likewise is invalid on substantive and procedural due process grounds because it fails to require a finding of dangerousness and to provide a mechanism for periodic review of the order.

¶ 4. We are satisfied that Wis. Stat. § 971.17(3)(c) and AD-11–97 comport with the due process provisions of the Fourteenth Amendment to the United States Constitution and Article I, Section 1 of the Wisconsin Constitution for two reasons. First, we conclude that due process does not require a finding of dangerousness to issue an order compelling involuntary medication of a person committed under Wis. Stat. ch. 971. Even if due process required such a finding, there would be no violation because the statutory language of Wis. Stat. § 971.17(3)(c), along with AD-11–97, effectively provide for such a finding. Second, we conclude that due process requires periodic review of the compelled involuntary medication order, and that Wis. Stat. § 971.17(3)(c) and AD-11–97 satisfy that requirement as well. Additionally, we are satisfied that Wood did not receive ineffective assistance of counsel. Accordingly, we hold that Wis.

Stat. § 971.17(3)(c), along with AD-11–97, comport with substantive and procedural due process facially and as applied here. We also affirm the circuit court's orders compelling involuntary medication and denying Wood's motion for relief from the involuntary medication order.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶ 5. Wood, who is 55 years old, has suffered from paranoid schizophrenia since at least his early twenties. In January 1978, while delusional from his mental illness, he beat his stepfather to death with a brick. He was found not guilty by reason of mental disease or defect (NGI) in regard to the charge of second-degree homicide and was committed to the custody of the Department of Health and Social Services, which placed him in institutional care at Mendota for 13½ years.[3] He was granted conditional release in 1991 and lived in a supervised housing situation in Madison and then in

---

[3] We take that description of Wood's first commitment from the State's first brief to us. However, we note that the record does not include the judgment and commitment order from the proceedings related to the murder of Wood's stepfather. The only indication of the outcome of that case in this record comes from psychiatric reports detailing Wood's medical and criminal history. In those reports, the examiner explained that Wood was found NGI of second-degree homicide and "served 13½ years at Mendota."

The parties do not appear to dispute that Wood was in fact committed under Wis. Stat. ch. 971 to the Department of Health and Social Services (the agency equivalent to DHFS at the time) for that murder, and that the agency placed him in Mendota for care for 13½ years. Hence, absent evidence in the record to the contrary, we accept the parties' characterization of those events and proceed on the assumption that Wood was committed for that murder.

Florida for several years. During that time, he initially remained on his medication and held a job, but, as he later told an examiner, he eventually stopped working and tapered off his medication. By the time Wood returned to Wisconsin in 1998, his mental health had deteriorated significantly. According to reports from examiners at Mendota, in January of that year, Wood was arrested in Viroqua, Wisconsin for disorderly conduct after exhibiting "bizarre" and potentially threatening behavior.

¶ 6. Following that arrest, Wood was admitted to Franciscan Skemp Medical Center in La Crosse "in an obvious psychotic state," according to the psychiatrist who treated him. Within less than a month, he sexually assaulted a female patient in the same facility. In January 1999, he was found NGI for that crime, and the La Crosse County Circuit Court held a commitment hearing pursuant to Wis. Stat. § 971.17(3) (1997–98). The court concluded that Wood posed a significant risk of danger to others and committed him to the custody of DHFS for a period of up to 160 months—two-thirds the maximum sentence for that crime pursuant to Wis. Stat. § 971.17(1)(a) (1997–98)—or not beyond September 2011. Wood remains at Mendota, which is where DHFS placed him in April 1999.

¶ 7. Since the start of that second commitment period, Wood has filed seven petitions for conditional release, none of which the circuit court granted.[4] For

_____

[4] The La Crosse County Circuit Court held hearings on the first five of those petitions and denied each of them on grounds that Wood would pose a risk if granted conditional release. Wood voluntarily sought dismissal of his sixth petition, conceding that he had "received two negative psychiatric reports and could not meet the requisite burden of proof." As to Wood's seventh petition, which he filed in September 2005, the record

each of those petitions, the circuit court appointed counsel and received reports from social workers and psychiatrists involved in Wood's treatment regarding Wood's condition, progress in treatment, and potential ability to function safely outside of Mendota. The information contained in the reports was consistent in four respects. First, the examiners believed that Wood was undermedicated; they indicated that he steadfastly refused to increase dosages despite staff recommendations to do so. Second, the reports indicated that although Wood's condition had not deteriorated enough to require a compelled medication order, his perpetually undermedicated state prevented him from being a candidate for conditional release. Third, Wood continued to deny responsibility for his past crimes and showed little insight into his treatment needs. Fourth, the evaluators consistently opined that Wood lacked the emotional stability necessary to be successful if granted conditional release.

¶ 8. In September 2006, Dr. Brad Smith, the forensic clinical director at Mendota, petitioned the circuit court to issue an order authorizing the administration of medication and treatment without Wood's consent pursuant to Wis. Stat. § 971.17(3)(c). Dr. Smith cited Wood's declining mental state, the escalation of his symptoms, and evidence that he had stopped taking his medication entirely. After holding a hearing on the petition, the La Crosse County Circuit Court, Judge Michael J. Mulroy presiding, found that the medication would have therapeutic value and that Wood was not

_____

contains a psychiatric evaluation in which the examiner opined that Wood remained a poor candidate for conditional release and a social worker's neutral report on Wood's condition and progress in treatment, but it does not appear that the court held a hearing or issued an order relating to that petition.

competent to refuse treatment or medication. It issued an order authorizing DHFS to administer medication to Wood without his consent. Wood filed a motion for relief,[5] arguing that Wis. Stat. § 971.17(3)(c) is unconstitutional and that his trial counsel was ineffective for failing to raise that argument and for other reasons. The circuit court denied that motion.

¶ 9. Wood appealed to the court of appeals, which certified the matter to this court. After filing briefs with this court, the State filed a motion to supplement the record with AD-11–97, which is an administrative directive maintained by DHFS that sets forth the procedure for staff at Mendota to follow when seeking an order to compel medication and treatment of forensic NGI patients and administering medication and treatment to them pursuant to such an order.[6] Wood agreed that AD-11–97 was germane to the issues presented. We remanded the matter. The La Crosse County Circuit Court, Judge Ramona A. Gonzalez presiding, held a hearing in May 2009 to supplement the record with evidence related to AD-11–97.[7]

¶ 10. At that hearing, Dr. Smith testified that Mendota staff followed the protocol set forth in AD-11–97 before seeking the October 2006 order to involuntarily medicate Wood. Mendota had established a

---

[5] Wis. Stat. § (Rule) 809.30(2).

[6] The procedures in the directive also apply to forensic patients housed at Winnebago Mental Health Institute.

A copy of the full directive appears in the appendix to the State's first brief to us. *See infra* note 10. We cite, for convenience, the directive when referring to or quoting relevant portions of it.

[7] That supplemental hearing did not produce any orders or judgments, and the parties do not challenge any aspect of that proceeding.

334

treatment team made up of a psychiatrist (Dr. Smith), a psychologist, a member of the nursing staff, the manager for Wood's residential unit, and a social worker. Dr. Smith further testified that that team considered four criteria required by AD-11–97 when it determined that (1) Wood was not competent to refuse medication; (2) an increased dosage of medication was in Wood's medical interest; (3) Wood presented a current risk of harm to himself or others if medication was not administered involuntarily; and (4) there were no alternative means to address Wood's dangerousness. Dr. Smith also testified that Mendota has not actually implemented the order to medicate Wood involuntarily, because Wood consented to take an increased oral dosage of medication. However, Dr. Smith explained that Wood did so with the knowledge that "there was an order to treat [using an injectable form of a different medication] that could be instituted if he did not take [the oral medication]."[8]

---

[8] Neither party argues that Wood's current compliance with the oral medication regimen renders this appeal moot. Indeed, there is support in case law for the parties' apparent position that the case is not moot, given that Wood continues to suffer from paranoid schizophrenia, has shown a pattern of refusing recommended treatment, and remains in the custody of DHFS, where he is still subject to the order he challenges here should he no longer consent to voluntarily take his medication. *See Washington v. Harper,* 494 U.S. 210, 218–19 (1990) (live controversy existed even though the state had ceased administration of antipsychotic drugs to the prisoner who continued to suffer from schizophrenia, continued to remain in the prison system, and remained subject to the challenged policy); *Vitek v. Jones,* 445 U.S. 480, 486–87 (1980) (live controversy existed where, but for injunction, nothing clearly prevented the challenged action from recurring). Additionally, it is not clear that Wood's compliance is truly "voluntary," given that he appeared to comply only

## II. ISSUES PRESENTED

¶ 11. Wood raises two primary challenges. First, he argues that Wis. Stat. § 971.17(3)(c) and AD-11–97 are unconstitutional because permitting involuntary medication without first requiring a finding of dangerousness violates his rights to (a) substantive due process and (b) procedural due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 1 of the Wisconsin Constitution. Second, he argues that his trial counsel was ineffective for failing to raise those constitutional issues as well as for other alleged failings.

¶ 12. We note here that Wood claims that Wis. Stat. § 971.17(3)(c) and AD-11–97 violate due process both facially and as applied. Given the distinctions between those two types of challenges, this is a sensible point to frame the standards for evaluating a facial and an as-applied challenge under these circumstances.

¶ 13. A party may challenge a law or government action as being unconstitutional on its face. Under such a challenge, the challenger must show that the law cannot be enforced "under any circumstances." *See Olson v. Town of Cottage Grove,* 2008 WI 51, ¶ 44 n.9, 309 Wis. 2d 365, 749 N.W.2d 211 (explaining differences between facial and as-applied challenges). If a challenger succeeds in a facial attack on a law, the law is void "from its beginning to the end." *State ex rel. Comm'rs of Pub. Lands v. Anderson,* 56 Wis. 2d 666,

when faced with an involuntary medication order. Moreover, even if this case were moot, we would decline to dismiss on that basis. The issues presented here are likely to arise again and resolution by this court will help avoid future uncertainty. *State v. Leitner,* 2002 WI 77, ¶ 15, 253 Wis. 2d 449, 646 N.W.2d 341.

672, 203 N.W.2d 84 (1973) (Anderson). In contrast, in an as-applied challenge, we assess the merits of the challenge by considering the facts of the particular case in front of us, "not hypothetical facts in other situations." *State v. Hamdan,* 2003 WI 113, ¶ 43, 264 Wis. 2d 433, 665 N.W.2d 785. Under such a challenge, the challenger must show that his or her constitutional rights were actually violated. If a challenger successfully shows that such a violation occurred, the operation of the law is void as to the party asserting the claim. *See Anderson,* 56 Wis. 2d at 672.

¶ 14. Given those approaches, Wood generally frames the issues before us as follows: (1) whether Wis. Stat. § 971.17(3)(c) and AD-11–97 are facially invalid because they permit compelled medication of a person without requiring a finding of dangerousness or requiring periodic review of the order in violation of his substantive and procedural due process protections and (2) whether the statute and directive are invalid as applied to him, to the extent that Mendota and the circuit court did not make findings of Wood's dangerousness before authorizing Mendota to medicate him without his consent, and that there are no adequate mechanisms in place for periodic review of the order. We assess each of those challenges in order and then address Wood's ineffective assistance of counsel claim.

### III. STANDARDS OF REVIEW

¶ 15. The constitutionality of a statute is a question of law that we review de novo. *State v. Hansford,* 219 Wis. 2d 226, 234, 580 N.W.2d 171 (1998). Although case law does not appear to address specifically the standard of review to be applied to an administrative

directive, we apply that same de novo standard to questions of whether a defendant has been denied due process. *See, e.g., State v. Sorenson,* 2002 WI 78, ¶ 25, 254 Wis. 2d 54, 646 N.W.2d 354. Further, we review a statute under the presumption that it is constitutional. *Hansford,* 219 Wis. 2d at 234. Accordingly, the party raising the constitutional claim—in this case, Wood— must prove that the challenged statute is unconstitutional beyond a reasonable doubt. *Id.* That presumption and burden apply to facial as well as to as-applied constitutional challenges. *See, e.g., Riccitelli v. Broekhuizen,* 227 Wis. 2d 100, 119, 595 N.W.2d 392 (1999) (stating presumption and burden for an as-applied due process challenge); *Hansford,* 219 Wis. 2d at 234 (stating presumption and burden for facial due process challenge).

¶ 16. A claim for ineffective assistance of counsel is a mixed question of fact and law. *See State v. Doss,* 2008 WI 93, ¶ 23, 312 Wis. 2d 570, 754 N.W.2d 150. We defer to the circuit court's factual findings unless they are clearly erroneous. *See id.* The conclusions as to whether an attorney's performance was deficient or prejudicial, however, are questions of law that we review independently. *Id.*

## IV. DUE PROCESS CHALLENGES

¶ 17. An individual's substantive and procedural due process rights are rooted in the Fourteenth Amendment to the United States Constitution, and Article I, Section 1 of the Wisconsin Constitution.[9] *Kenosha County Dep't of Human Servs. v. Jodie W.,* 2006 WI 93,

---

[9] The United States and Wisconsin constitutions generally provide due process guarantees with no substantive differences.

338

¶ 39 & n.17, 293 Wis. 2d 530, 716 N.W.2d 845. "The right to substantive due process addresses 'the content of what government may do to people under the guise of the law.' " *Dane County Dep't of Human Servs. v. Ponn P.*, 2005 WI 32, ¶ 19, 279 Wis. 2d 169, 694 N.W.2d 344 (quoting *Reginald D. v. State,* 193 Wis. 2d 299, 307, 533 N.W.2d 181 (1995)). An individual's substantive due process rights protect against a state action that is arbitrary, wrong, or oppressive, without regard for whether the state implemented fair procedures when applying the action. *Ponn P.,* 279 Wis. 2d 169, ¶ 19 (citing *Monroe County Dep't of Human Servs. v. Kelli B.,* 2004 WI 48, ¶ 19, 271 Wis. 2d 51, 678 N.W.2d 831). In contrast, the question of fairness is addressed as a matter of procedural due process. In other words, even if a challenge that a government action deprives " 'a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner.' " *State v. Laxton,* 2002 WI 82, ¶ 10 n.8, 254 Wis. 2d 185, 647 N.W.2d 784 (quoting *United States v. Salerno,* 481 U.S. 739, 746 (1987)). We begin with Wood's challenge under substantive due process principles.

A. Substantive Due Process Requirements

¶ 18. A court's task in a challenge based on substantive due process "involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state

*Compare* U.S. Const. Amend. XIV *with* Wis. Const. Art. I, § 1. Accordingly, we do not distinguish between those constitutional protections in this case. *State v. Laxton,* 2002 WI 82, ¶ 10 n.7, 254 Wis. 2d 185, 647 N.W.2d 784.

interests might outweigh it." *Washington v. Harper,* 494 U.S. 210, 220 (1990) (internal quotation marks and citing reference omitted). The precise context presented here—the constitutionality of a statute authorizing an order to compel medication of a person committed pursuant to ch. 971—is one of first impression for Wisconsin state courts. Wood urges us to find persuasive guidance in *Enis v. Department of Health and Social Services,* 962 F. Supp. 1192, 1202–03 (W.D. Wis. 1996), in which the federal district court held that Wis. Stat. § 971.17(3)(c) was unconstitutional. As an initial matter, federal district court cases are not binding authority on this court. *See State v. Mechtel,* 176 Wis. 2d 87, 94–95, 499 N.W.2d 662 (1993). Moreover, in our view, *Enis* is not persuasive. Although we agree with aspects of that court's analysis, we decline to adopt much of its reasoning or its bottom line, for the reasons explained herein. Rather, we look to several of the United States Supreme Court's cases assessing orders to compel medication in other contexts.

¶ 19. In *Washington v. Harper,* Harper, a mentally ill prisoner, challenged the constitutionality on due process grounds of a Washington state prison policy that authorized an order to compel medication of incompetent mentally ill prisoners, if the state established "by a medical finding, that a mental disorder exists [that] is likely to cause harm if not treated" and that the medication sought was "in the prisoner's medical interests." 494 U.S. at 222.

¶ 20. The United States Supreme Court first defined Harper's substantive right, finding that he had a "significant" liberty interest in refusing the administration of antipsychotic drugs. *Id.* at 221. That right, however, was tempered by other interests, including his medical needs and the legitimate needs of the institu-

tion in maintaining security and safety within its prisons. In light of those interests, the court held that the policy

> is a rational means of furthering the State's legitimate objectives. Its exclusive application is to inmates who are mentally ill and who, as a result of their illness, are gravely disabled or represent a significant danger to themselves or others. The drugs may be administered for no purpose other than treatment, and only under the direction of a licensed psychiatrist. There is considerable debate over the potential side effects of antipsychotic medications, but there is little dispute in the psychiatric profession that proper use of the drugs is one of the most effective means of treating and controlling a mental illness likely to cause violent behavior.

*Id.* at 226.

¶ 21. Two years later, the United States Supreme Court in *Riggins v. Nevada,* 504 U.S. 127 (1992), addressed the constitutionality of an order compelling medication to a person detained for trial. In that case, the detainee, Riggins, was charged with murder and robbery and was subject to an order to compel medication during the trial. *Id.* at 129–30. Riggins sought to suspend the order during his trial, where administration of the drug was not necessary to render him competent to stand trial and where he sought to show the jury his demeanor and "true mental state." *Id.* at 130. The district court denied that motion. At trial, Riggins presented an insanity defense, but the jury found him guilty and set his sentence at death. *Id.* at 131.

¶ 22. The Court in *Riggins* extended the application of the holding in *Harper* to pretrial detainees, concluding that the state cannot compel administration of antipsychotic medication to such persons absent a

finding of the state's overriding justification to administer the drugs and a determination of medical appropriateness. Because the state did not demonstrate such an overriding justification, the Court reversed the defendant's conviction. *Id.* at 135. However, the Court indicated that, given the "unique circumstances of penal confinement," *id.* at 134, one way that a state could demonstrate an overriding justification was if it proved that the treatment was medically appropriate and, in light of less intrusive alternatives, that it was necessary for the detainee's or others' safety, *id.* at 135.

¶ 23. The federal district court in *Enis* largely relied on *Harper* and *Riggins* in reaching its conclusion that Wis. Stat. § 971.17(3)(c) was unconstitutional. In that case, Enis, who was mentally ill, had been found NGI and was subsequently determined to be incompetent to refuse medication under § 971.17(3)(c). He brought suit under 42 U.S.C. § 1983 and moved for summary judgment on his claim for injunctive and declaratory relief. The district court granted Enis's motion, concluding that a finding of "present dangerousness and present need for medication [to] justify the significant intrusion represented by the forced administration of psychotropic medication" is required under a statutory scheme providing for the forced medication of committed individuals based on a finding of NGI. *Enis,* 962 F. Supp. at 1199. The district court held that Wis. Stat. § 971.17(3)(c) was unconstitutional to the extent that it did not require a finding of the person's present dangerousness or that no such finding was made as to Enis. *Id.*

¶ 24. Thirteen years after the Supreme Court decided *Harper,* eleven years after it decided *Riggins,* and seven years after the district court issued *Enis,* the United States Supreme Court again addressed require-

ments for compelled medication orders in *Sell v. United States,* 539 U.S. 166 (2003). At issue in *Sell* was the constitutionality of a law permitting a court to order forcible antipsychotic medication to a defendant in order to restore him to competency to stand trial for a nonviolent crime. In that case, the Court determined that *Harper* and *Riggins* stood for the standard that a court could order a mentally ill defendant to be medicated without his or her consent if (1) the treatment was medically appropriate, (2) the treatment was substantially unlikely to have side effects that could undermine the fairness of trial, and (3) less intrusive alternatives had been considered. *Sell,* 539 U.S. at 179. In other words, a finding of dangerousness was just one way to support a forced medication order; however, it was not a required element of an involuntary medication statutory scheme in all contexts.

¶ 25. To summarize, *Harper, Riggins,* and *Sell* compel the following conclusions. First, a person competent to make medical decisions has a "significant" liberty interest in avoiding forced medication of psychotropic drugs. *See Harper,* 494 U.S. at 221. Second, in light of that interest, the state may not order the administration of psychotropic drugs to a mentally ill individual unless it demonstrates an overriding justification to administer the drugs and a determination of medical appropriateness. *See Riggins,* 504 U.S. at 135. The incursions that substantive due process permits largely depend on what the state's overriding interest entails. For example, in the context of a mentally ill inmate or detainee in a jail or prison, where the safety and security of the institution is the state's interest, one way the state can establish an overriding justification addressing that interest is to demonstrate that the

person is dangerous to self or others and, considering less intrusive alternatives, that medication is in the person's medical interest. *See Riggins,* 504 U.S. at 134–35; *Harper,* 494 U.S. at 225–26. In other contexts, however, such as when the state seeks to administer medication to render a nonviolent detainee competent to stand trial, dangerousness need not be demonstrated; rather, a finding that the administration of drugs will affect the defendant's rights to a fair trial is sufficient. *See Sell,* 539 U.S. at 180–81.

¶ 26. Here, Wood argues that Wis. Stat. § 971.17(3)(c) violates due process facially and as applied. He asserts that, as the court of appeals noted in its certification opinion, the state has not fully articulated what its overriding interest is in medicating a committed person who has been found NGI of a crime. He acknowledges that the State has an interest in maintaining safety in an institutional context such as Mendota, but argues that to invoke that interest, the State would first need to demonstrate the person's present dangerousness within the facility, a finding that the statute does not require and that the circuit court did not expressly make in this instance. He further argues that an institution such as Mendota is equipped to deal with patients who would be a danger beyond its confines. Because of that, Wood argues that the State needs to show that a patient is dangerous in the context of the institution.

¶ 27. The State responds that it has at least two overriding interests in medicating an individual adjudged NGI for a violent crime. First, the State has a prospective interest in protecting society, inasmuch as individuals adjudged NGI are committed precisely because their mental illness caused them to engage in criminal behavior. Given that premise, the State argues

that its interest is to treat that person in a manner that prepares him or her for a safe return to society. Second, the State argues that it has an interest in maintaining the safety and functionality of the institutional environment, which it cannot and should not be forced to address solely by equipping the institutions to deal with people who behave unpredictably and dangerously.

¶ 28. Given those justifications, the State further argues that in cases involving a person committed after being found NGI, a finding of dangerousness is not necessary because the judgment of NGI and decision to institutionalize that individual demonstrates that the person suffers from a mental illness that, if left untreated, causes him or her to be dangerous. *See* Wis. Stat. § 971.15(1)(d) (no culpability for criminal conduct where a mental disease causes the person to lack "substantial capacity either to appreciate the wrongfulness of his or her conduct or conform his or her conduct to the requirements of law"); § 971.17(3)(a) ("The court shall order institutional care if it finds by clear and convincing evidence that conditional release of the person would pose a significant risk of bodily harm to himself or herself or to others or of serious property damage."). Further, it argues that even if a finding of dangerousness is required, the record here is sufficient to support such a finding in this case based on Wood's past crimes and consistent unsuitability for conditional release.

### 1. Facial Challenge to Wis. Stat. § 971.17(3)(c) on Substantive Due Process Grounds

¶ 29. Before we address the parties' arguments, a brief overview of Wisconsin's involuntary medication and treatment statutes is helpful to aid the discussion. There are several contexts in which a court may order

the involuntary medication of a committed person in Wisconsin. For example, Wis. Stat. § 51.20 governs the involuntary medication and treatment of civilly committed individuals as well as criminal commitments. *See also* Wis. Stat. § 51.37. Wis. Stat. § 971.14(3)(dm) provides for the involuntary medication of defendants where there is a question of competency to stand trial. Wis. Stat. § 971.17(3)(c), the provision at issue here, specifically applies to the involuntary medication of persons committed after being adjudged NGI for a crime. We briefly consider that process.

¶ 30. A defendant charged with a criminal offense may plead NGI. Wis. Stat. § 971.06(1)(d). If the defendant is so found, the court enters a judgment of NGI and issues a commitment order under § 971.17. In the order, the court commits the defendant to the custody of DHFS and specifies that he or she is to be placed in an institution if the court "finds by clear and convincing evidence that conditional release of the person would pose a significant risk of bodily harm to himself or herself or to others or of serious property damage." Wis. Stat. §§ 971.165(2), 971.17(3)(a). In making that determination, the court may consider, among other things,

> the nature and circumstances of the crime, the person's mental history and present mental condition, where the person will live, how the person will support himself or herself, what arrangements are available to ensure that the person has access to and will take necessary medication, and what arrangements are possible for treatment beyond medication.

Wis. Stat. § 971.17(3)(a). If the court does not make such a finding of "a significant risk," it must order conditional release. *Id.*

¶ 31. After the person has been committed to an institution, it sometimes becomes necessary to make a

346

decision about forcibly medicating him or her. If the state proves by clear and convincing evidence that the committed person is not competent to refuse medication, the court may issue an order permitting the institution to administer medication and treatment without the person's consent. Wis. Stat. § 971.16(3) sets forth the circumstances under which the institution may obtain such an order

> if, because of mental illness, developmental disability, alcoholism or drug dependence, and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the defendant, one of the following is true:
>
> (a) The defendant is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
> (b) The defendant is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

¶ 32. With that statutory context in mind, we address the parties' arguments. Given the case law, we agree with the parties that the scope of substantive due process protections required depends upon what the State's overriding interest is in administering psychotropic medications to a patient against his or her will. As an initial matter, it appears that the parties agree that the State has an interest in maintaining safety, security, and functionality within the institution. Indeed, that interest is well-established. *See Riggins,* 504 U.S. at 135; *Harper,* 494 U.S. at 225–26. We agree with the State, however, that it has at least one other

interest in medicating NGI individuals. Based on the operation of the statutory scheme, adjudging an individual NGI has the effect of holding that, because of mental illness, the individual commits crimes for which he or she lacks "substantial capacity either to appreciate the wrongfulness of his or her conduct or conform his or her conduct to the requirements of law." Wis. Stat. § 971.15(1). In that way, institutions holding individuals adjudged NGI have a somewhat different interest than a prison would. In an institution such as Mendota, that interest is in treating the underlying mental illness in order to prevent more criminal behavior and prepare the individual for conditional release and for eventual release from the commitment.

¶ 33. In light of that overriding interest and the nature of original proceedings in which a defendant is adjudged NGI, we do not believe that a finding of present dangerousness is required when considering whether to issue an order to forcibly medicate such an individual. *See Sell,* 539 U.S. at 181–82 (a finding of dangerousness is not required where the relevant state interest is unrelated to institutional safety and security). The express findings required in Wis. Stat. § 971.17(3)(c) and articulated in § 971.16(3) are that the person cannot express an understanding of the advantages, disadvantages, and alternatives to medication or treatment or that he or she has such an understanding but cannot apply it to his or her mental illness in order to make an informed choice. We are satisfied that those findings strike the appropriate balance between the State's overriding interest in medicating a forensic NGI patient and that patient's interest in having the ability to refuse medication or treatment.

¶ 34. Even if we were to conclude that the State's interest in preparing NGI patients for conditional re-

lease was not acceptable, there remains its overriding interest in the safety and security of the institution. Assuming, based on *Harper*, that that interest requires a finding of present dangerousness, we are satisfied that Wis. Stat. § 971.17(3), at a minimum, implicitly provides for such a finding. We reach that conclusion based on the language of § 971.17(3)(a) that includes requirements for a determination of dangerousness at the time of commitment, the language of § 971.17(3)(c) requiring a doctor's examination and report when an institution seeks an order to medicate the patient involuntarily, and the language of § 971.17(4)(d) setting forth requirements for periodic reviews, which include a dangerousness determination. Those express requirements, taken together, provide for at least an implicit finding of dangerousness that serves as a basis for a court considering whether to issue an order to medicate.

¶ 35. The statutory language of Wis. Stat. § 971.17(3)(a) requires a finding that is the equivalent of one of dangerousness at time of commitment. As we noted previously, that statute provides:

> The court shall order institutional care if it finds by clear and convincing evidence that conditional release of the person would pose a significant risk of bodily harm to himself or herself or to others or of serious property damage.

Wis. Stat. § 971.17(3)(a). In other words, a person found NGI will be placed in institutional care in the first place only if the court finds clear and convincing evidence of "a significant risk," which appears to be the equivalent of dangerousness.

¶ 36. Additionally, if the institution files a motion seeking an order to compel medication, the statute

349

further requires a licensed physician to examine the individual and to issue a written report indicating that the person "needs medication or treatment and that the person is not competent to refuse medication or treatment." Wis. Stat. § 971.17(3)(c). We are satisfied that such an assessment further encompasses an assessment of "a significant risk." Considering that absent a finding of substantial risk—the equivalent of dangerousness—individuals committed under § 971.17(3) are granted conditional release, the doctor's examination and report under paragraph (c) necessarily requires at least an implicit finding that the person remains dangerous enough to justify continued institutional care.

¶ 37. Finally, the court must reassess dangerousness when the committed individual petitions for conditional release, which the statute permits such an individual to do every six months. When a committed individual petitions for conditional release, Wis. Stat. § 971.17(4)(d) provides that the court must grant the petition for such release:

> unless it finds by clear and convincing evidence that the person would pose a significant risk of bodily harm to himself or herself or to others or of serious property damage if conditionally released.

Again, making that determination, the court considers the same factors as it did with the initial commitment, such as the nature of the crime and that person's history of mental illness to inform its determination.

¶ 38. Those requirements, taken together, create at least an implicit finding of dangerousness, if not an express finding, that serves as a basis for a court to consider granting a motion for an involuntary medication order. In other words, those findings of dangerous-

350

ness based on the original commitment under § 971.17(3) and based on the denial of a petition for conditional release under § 971.17(4)(d) continue to be present until they are changed or upset. With such a basis present, a court evaluating a motion for an involuntary medication order need not make separate or independent findings of dangerousness.

¶ 39. For those reasons, we are satisfied that Wis. Stat. § 971.17(3)(c) facially satisfies substantive due process protections.

### 2. Facial Constitutionality of AD-11–97 on Substantive Due Process Grounds

¶ 40. Wood further argues that AD-11–97 fails to comport facially with substantive due process because it does not adequately require a finding of dangerousness before institutional staff may seek an order to medicate or administer medication pursuant to such an order. The State disagrees. It asserts that due process does not require an express finding of dangerousness before seeking an order or administering psychotropic medications to persons committed under ch. 971. It further contends that, to the extent that due process does require such a finding, the directive sets forth standards for a finding of dangerousness that comport with the requirements set forth in *Harper*. We agree with the State. Due process does not require a finding of dangerousness under the circumstances presented here; however, if it did, we are satisfied that AD-11–97 provides adequate standards for a finding of dangerousness, as explained herein.

¶ 41. As noted previously, AD-11–97 is the protocol for staff at Mendota and Winnebago Mental Health Institute to follow when deciding whether to seek an

order to medicate a patient at one of those facilities and whether to administer medication to that patient pursuant to such an order. The directive first requires a treatment team, made up at least of "the patient's psychiatrist, a non-physician clinician and a member of the Nursing Staff," to assess the patient's situation before seeking the order.[10] The team must conclude that the patient meets all four of the following criteria: (1) the patient is not competent to refuse medication; (2) medication serves the patient's medical interests; (3) the patient meets "the 'dangerousness' standard"; and (4) no acceptable alternative means are available "to address the patient's dangerousness."[11] Furthermore, AD-11–97 requires the treatment team, should it begin medicating a patient pursuant to an order, to conclude that the patient continues to satisfy all four criteria "at the appropriate review schedule," which is to occur six months after the ordered treatment begins and annually thereafter.[12]

¶ 42. Those four required findings, like the requirements in Wis. Stat. § 971.17(3)(c), more than adequately address the concern of protecting the individual's liberty interest, while recognizing the State's interest in medicating and treating individuals who are not competent to make their own treatment decisions. Indeed, Wood does not argue otherwise; rather, as noted previously, he focuses on the requirement for a finding of dangerousness and argues that the

---

[10] Dep't of Health & Family Servs., Administrative Directive AD-11–97 1 (Apr. 22, 1997), *reproduced in* Brief & Appendix on Behalf of Plaintiff-Respondent State of Wisconsin at R. App. 101–09, State v. John A. Wood, No. 07AP2767–CR (Wis. Nov. 3, 2008) [hereinafter AD-11–97].

[11] *Id.* at 2–3.

[12] *Id.* at 4–5.

standards found in AD-11–97 are inadequate. Again, even if we were to assume that due process requires an express finding of dangerousness, the third requirement provides a more than adequate standard.

¶ 43. To satisfy the third requirement, the treatment team is to determine "that there is a current risk of harm to self or others if medication [is] not administered."[13] The directive then provides six "possible consequences" that the treatment team, if it concludes they are likely to occur, must use as a basis for the finding of dangerousness:

a. The patient may suffer significant psychological harm, for example[,] mental anguish, pain, suffering, fear, anxiety or desperation, if medication was not administered;

b. The patient may cause physical harm to others in the facility if medication was not administered, considering the patient's history of physical violence and treatment history;

c. There may be harm to the prospects for successful treatment of the patient's mental condition if medication was not administered, for example, the patient's mental condition may become increasingly resistant to treatment the longer the patient does not take medications;

d. The patient may cause self-harm if medication was not administered, considering the patient's history of self-abuse, treatment history and the potential effectiveness of medication in addressing the behavior;

e. The patient may suffer significant deterioration to his or her health or safety if medication was not administered, considering the effect of the patient's

---

[13] *Id.* at 2.

mental condition on the patient's ability or willingness to receive care that is essential for health or safety; AND/OR

f. The patient may cause physical harm to others outside the facility if medication was not administered, considering the patient's history of physical violence, the patient's treatment history, the proximity of the patient's probable release date, the likelihood of adequately treating the patient's mental condition without medications before release, and the adequacy of means available in the community to prevent the patient from causing harm to others.[14]

¶ 44. Wood argues that the standards are facially overbroad and vague in several respects.[15] Essentially, Wood objects to the (1) breadth of general symptoms considered, particularly in consequences a and e; (2) the content of consequence c, which he argues does not relate to a finding of dangerousness; and (3) the permissible consideration of past physical violence in consequences b, d, and f.

---

[14] *Id.* at 2–3.

[15] We note that generally, when a court reviews a facial vagueness challenge, provided it does not implicate protected conduct, a court upholds "the challenge only if the enactment is impermissibly vague in all of its applications." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–95 & n.7 (1982). Courts therefore look to the application of the challenged law or action to the challenger before considering hypothetical applications. *See id.* at 495; *see also United States v. Mazurie,* 419 U.S. 544, 550 (1975)("[V]agueness challenges to statutes [that] do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."). Accordingly, we would need to reach Wood's facial challenge on vagueness grounds only if he could demonstrate that the directive was impermissibly vague as applied to him. We are satisfied that he is unable to do that here.

¶ 45. We disagree with Wood that the symptoms listed are overbroad. While the symptoms in consequences a and e, listed singly, may be not uncommon symptoms, those paragraphs frame the symptoms as causing a risk of "significant psychological harm" and "significant deterioration" to the patient's health and safety. That context, in our view, raises those symptoms to a level beyond those occurring in patients not in need of involuntary medical intervention. Moreover, the content of consequence c, which addresses whether medication is necessary to ensure the future effectiveness of medication and treatment, is related to dangerousness, inasmuch as unsuccessful treatment of the patient's mental illness results in a risk to the patient's safety, as well as the public's, given that the patient will be released eventually from the institution. Finally, past violence is relevant to a finding of current dangerousness. Although we agree with the district court's statement in *Enis* that when a finding of dangerousness is required, that finding must show *present* dangerousness, nothing in *Harper, Riggins,* or *Sell* precludes a court from considering the individual's past crimes when assessing present dangerousness. Indeed, where a person's past acts of violence were products of mental illness, consideration of the nature and seriousness of those past violent crimes is vital to assessing the level of danger posed when the mental illness is untreated.

■

¶ 46. In summary, we are satisfied that a finding of dangerousness is not required to order the involuntary medication of an individual committed under Wis. Stat. § 971.17. By that reasoning, Wis. Stat. § 971.17(3)(c) and AD-11–97 cannot be deemed to be facially invalid based on substantive due process requirements. Moreover, even if a finding of dangerous-

ness is required, the directive requires an express finding of dangerousness and the statute implicitly contains the equivalent of an express requirement. Hence, they are not facially invalid.

3. As-Applied Challenges to Wis. Stat. § 971.17(3)(c) and AD-11–97 on Substantive Due Process Grounds

¶ 47. We next turn to Wood's argument that, based on substantive due process grounds, the provisions in question here are invalid as applied to him. We disagree with his position. As an initial matter, given our determination herein that a finding of dangerousness is not required in this situation, and that Wis. Stat. § 971.17(3)(c) and AD-11–97 comport with substantive due process requirements, nothing in the record indicates that the court did not take the steps required by § 971.17(3)(c) in issuing its order. Additionally, nothing contradicts evidence that Mendota staff established all four criteria required by AD-11–97 when determining whether to file a motion for the hearing to compel medication. Moreover, there is nothing specific to Wood's situation or any of the facts presented here that suggests that the application of the statute or directive violated his substantive due process rights.

¶ 48. Additionally, we are persuaded that the treatment team's finding of dangerousness is supported by evidence in the record, and that that standard was not vague. As noted above, the directive requires the treatment team at Mendota to agree that the person for whom it is seeking the order is dangerous, based on the six provided consequences. Dr. Smith testified that the team considered all six consequences listed in the directive, but found three to be most applicable and of most concern, notably, consequence a, related to Wood's history of serious dangerousness based on his criminal

356

behavior that occurred when his illness was not adequately treated; consequence b, related to the significant mental anguish and anxiety caused by the increased delusions his illness was causing; and consequence c, related to the fact that the symptoms of schizophrenia, if left untreated, grow progressively more difficult to treat and eventually become untreatable.

¶ 49. Wood asserts that consequence a is an improper consideration in assessing his present dangerousness. He argues that the only evidence of his propensity to act violently comes from two crimes committed over 10 and 31 years ago. Further, he emphasizes that there is no evidence that he has engaged in violent incidents in his past 10 years residing at Mendota. In Wood's view, those circumstances cannot lead to an adequate finding of present dangerousness.

¶ 50. The fact that Wood may not have engaged in overtly violent acts while at Mendota certainly could mitigate against a finding of present dangerousness; however, that evidence alone is not dispositive. Indeed, the evidence in the record is sufficient to support the treatment team's conclusion that Wood is presently dangerous. Wood's past crimes were unquestionably violent. He was found NGI for a brutal murder—beating his stepfather to death with a brick—while suffering from delusions caused by his then-untreated mental illness. He was also found NGI of sexual assault of another patient in an institutional setting. Except for a period of seven years, he has been institutionalized for the past 30 years, and he continues to deny culpability for his crimes. Moreover, his history in dealing with his mental illness further supports the conclusion that he remains dangerous. He has a pattern of refusing to

increase medication to levels needed to manage his symptoms and he has shown a severe lack of insight regarding his needs and behavior. Most compellingly, he was deemed by staff at Mendota to be deteriorating rapidly. Dr. Smith cited evidence that Wood had surreptitiously stopped taking all medication and was beginning to engage in behavior that, if it continued to escalate, would jeopardize staff and other patients. Finally, each of the seven petitions for conditional release that Wood filed during his time at Mendota failed, chiefly because of evidence that he remains a risk.

¶ 51. Accordingly, we are satisfied that Wis. Stat. § 971.17(3)(c) and AD-11–97 are valid on substantive due process grounds, both facially and as applied to Wood.

### B. Procedural Due Process Challenges

¶ 52. As noted previously, patients have a liberty interest in avoiding the administration of medication against their will. *State v. Anthony D.B.*, 2000 WI 94, ¶ 27, 237 Wis. 2d 1, 614 N.W.2d 435. The primary procedural due process protection required in light of that liberty interest is periodic review of the order to compel medication. *Id.* That review need not be judicial, so long as there are adequate alternative procedures in place. *See Harper*, 494 U.S. at 231–33.

¶ 53. For example, in *Harper*, the United States Supreme Court upheld a medication policy applied to mentally ill prisoners that required several aspects of review. First, at the time that the institution seeks the order to compel medication, an inmate is entitled to a

hearing before a special committee made up of a psychiatrist, a psychologist, and the superintendent of the institution, none of whom are involved in the inmate's treatment or diagnosis. *Id.* at 215. Second, the committee is required to review the inmate's case within 14 days of involuntary treatment. *Id.* at 216 & n.4. Thereafter, the treating psychiatrist is required to prepare and submit biweekly reports to the department medical director, and a new hearing is required every six months. *Id.*

¶ 54. In light of *Harper*, this court in *Anthony D.B.* evaluated whether a statute authorizing orders to compel medication of persons committed pursuant to Wis. Stat. ch. 980 satisfied procedural due process requirements. 237 Wis. 2d 1, ¶ 8. In that case, we held that the annual review of the commitment order itself necessarily must include a review of the order to medicate. In doing so, we emphasized several points that are relevant here: First, invoking *Harper*, we noted the importance of "an independent review of the medical order." *Id.*, ¶ 30. Second, we held that the patient has a right to petition for judicial review of the order. *Id.*, ¶ 33. Finally, we concluded that an order for compelled medication would expire if it did not receive periodic review. *Id.*, ¶ 34.

¶ 55. Here, Wood argues that Wis. Stat. § 971.17(3)(c) contains no provision for periodic review and hence must fail facially and as applied. He likewise argues that to the extent that AD-11–97 contains provisions requiring periodic review, those provisions are constitutionally inadequate, both facially and as applied. We disagree.

### 1. Facial Challenge: Wis. Stat. § 971.17(3)(c) on Procedural Due Process Grounds

■

¶ 56. We are satisfied that Wis. Stat. § 971.17(3)(c) is facially valid on procedural due process grounds for two primary reasons.

¶ 57. First, the statute requires that the court grant a conditional release hearing, which the committed person may request every six months. Wis. Stat. § 971.17(4). Although that review is not specific to the medication order, we are satisfied that it must necessarily include a review of the medication order. *See, e.g., Anthony D.B.,* 237 Wis. 2d 1, ¶ 31 (holding that by reading the statute governing involuntary medication of prisoners under ch. 51 together with ch. 980, a review of an order to compel medication is required).

¶ 58. Second, we believe that other language in Wis. Stat. § 971.17 implicitly requires periodic review. Specifically, the portions of the statute requiring that "whoever administers the medication or treatment to the person shall observe appropriate medical standards," Wis. Stat. § 971.17(3)(b)-(c), would include periodic review of the order. As a general matter, we assume that a doctor observing "appropriate medical standards" will not administer medication without a patient's consent if the patient is capable of consenting, the medication is not in the patient's best interest, the patient is not dangerous, or there are less intrusive means to treat the patient. *Accord Harper,* 494 U.S. at 222 n.8 ("[W]e will not assume that physicians will prescribe [antipsychotic] drugs for reasons unrelated to the medical needs of the patients[.]"). The ethical code governing the medical profession supports that assumption in its general statement that "[p]hysicians

360

should not provide, prescribe or seek compensation for medical services that they know are unnecessary." Am. Med. Ass'n, *Code of Medical Ethics, Current Opinions,* Opinion 2.19 at 81 (2008–09 ed.). More specifically, in relation to court-initiated medical treatment, the code provides,

> Physicians can ethically participate in court-initiated medical treatments *only if the procedure being mandated is therapeutically efficacious and is therefore undoubtedly not a form of punishment or solely a mechanism of social control.* . . . In accordance with ethical practice, physicians should treat patients based on sound medical diagnoses, not court-defined behaviors.

*Id.,* Opinion 2.065 at 28 (emphasis added).

¶ 59. At the very least, we understand "appropriate medical standards" to require compliance with internal practice policies of the institution, which in this case are embodied in AD-11–97. As we explain herein, AD-11–97, facially and as applied by the staff at Mendota in practice, more than adequately safeguards procedural due process protections.[16]

---

[16] This is of course not to say that AD-11–97 would render a statute valid if that statute were otherwise facially constitutionally defective. Again, we emphasize that Wis. Stat. § 971.17(3)(c) is not facially unconstitutional based on procedural due process requirements. AD-11–97 is not a "rule" adopted under rulemaking standards. Wis. Stat. § 227.01(13)(a). Because of that, it can be changed or amended at any time. Thus, it cannot be said to be part of the statutory or administrative scheme.

However, to the extent that the directive comports with due process requirements and that staff complied with the directive's requirements that evidence goes to the analysis of whether the State constitutionally applied the statute to Wood.

## 2. Facial Challenge: AD-11–97 on Procedural Due Process Grounds

¶ 60. We begin by looking at the relevant provisions contained within AD-11–97. The directive provides that administrative review of the order must occur six months after the order to treat was issued (regardless of whether staff actually began administering the medication).[17] After that initial review, reviews are to occur annually.[18] The treatment team conducts those reviews, during which the team must conclude that all four criteria are met, thus justifying the patient's involuntary medication.[19]

¶ 61. The directive also sets forth patient appeal rights. If a court issues an order to treat a patient involuntarily and the four criteria are clearly established in the order, the patient has a right to judicial review, not administrative review, for the first six months after the order is issued.[20] Thereafter, when the treatment team holds administrative reviews of the

Moreover, if DHFS or Mendota were to change substantively or eliminate the directive as it has been presented to us, those changes could affect an as-applied analysis in subsequent cases.

[17] AD-11–97, *supra* note 10, at 4.

[18] *Id.* That is the protocol for situations where the court issues an order to treat and all four of the criteria are "clearly established in [the] order." If the court issues an order and all four criteria were not clearly established in the order, the directive requires administrative review before any involuntary administration of psychotropic medications, at which point the treatment team must conclude that all four criteria are satisfied. If that is the case, the team may begin administering the medication. A second administrative review must then occur six months after that medication commences.

[19] *Id.*

[20] *Id.* at 7.

order—as we noted previously, initially six months after the court issues the order and annually thereafter—the patient may appeal the treatment team's determination at those reviews to an independent review panel.[21] The directive requires that panel to be made up of:

> at least [three] members consisting of a combination of the following facility staff, none of whom are members of the patient's treatment team: a physician; a psychologist; and, the facility Director or designee.[22]

At that hearing, the treatment team has the burden to show by a preponderance of the evidence that all four criteria required either to begin or to continue administration of psychotropic medication have been satisfied. The panel may further ask questions of the patient and of a member of the treatment team. The panel then issues its decision within five days. If it concludes by a majority that includes the physician member that all four criteria have been met, the panel will uphold the order to medicate. Otherwise, it will reverse or modify the decision to medicate the patient involuntarily.[23]

¶ 62. Wood asserts that AD-11–97 does not comport with procedural due process requirements facially in two respects. First, in his view, the directive fails because the treatment team, which is made up of staff involved with the patient's day-to-day care, conducts the initial determination and administrative review. He argues that due process requires an independent decisionmaker to review the order. He cites for support *Harper*, 494 U.S. at 233, in which the United States Supreme Court observed that the policy in question

---

[21] *Id.*

[22] *Id.* at 2.

[23] *Id.* at 7–9.

adequately addressed the "independence of the decisionmaker . . . . None of the hearing committee members may be involved in the inmate's current treatment or diagnosis." He also invokes *Anthony D.B.*, 237 Wis. 2d 1, ¶¶ 30–31, in which we emphasized the importance of an independent review of the medical order.

¶ 63. Second, Wood asserts that the frequency of the review is inadequate to safeguard procedural due process protections. He compares the reviews required here (at six months and then annually thereafter) with those mandated by the policy in *Harper* (initial review within 14 days and then every six months thereafter, with the administering physician submitting biweekly reports) to support his proposition that the reviews here do not occur with sufficient frequency to satisfy procedural due process.

¶ 64. As to the first argument related to independent review, we disagree that due process requires the type of independent decisionmaker that Wood advocates. As the State points out, reading on from that portion of *Harper* that Wood quotes, the Supreme Court expressly explains that it did not require an independent decisionmaker to review the decision to medicate.

> In the absence of record evidence to the contrary, we are not willing to presume that members of the staff lack the necessary independence to provide an inmate with a full and fair hearing . . . . In previous cases involving medical decisions implicating similar liberty interests, we have approved use of similar internal decisionmakers. . . . [I]t is only by permitting persons connected with the institution to make these decisions that courts are able to avoid "unnecessary intrusion into either medical or correctional judgments."

*Harper,* 494 U.S. at 233–35 (quoting *Vitek v. Jones,* 445

U.S. 480, 496 (1980)) (citations omitted). Moreover, even if an independent decisionmaker is required, we are satisfied that that requirement is addressed by the directive's provision for further review of the treatment team's decisions by an independent panel, "none of whom are members of the patient's treatment team."

¶ 65. As to the alleged infrequency of review, we also reject that argument. The fact that the reviews required by the policy in *Harper* occur more frequently than they do under the policy here does not necessarily compel the conclusion that less frequent reviews violate procedural due process. Indeed, we have held that periodic annual review of orders to compel medication on persons committed under Wis. Stat. chap. 980 sufficiently satisfies due process. *See Anthony D.B.*, 237 Wis. 2d 1, ¶ 31. We are persuaded that the review protocol required by the directive occurs with sufficient frequency.

¶ 66. In sum, we are satisfied that AD-11–97 is not facially invalid on procedural due process grounds. Here, the directive requires that the treatment team members agree that the patient is not competent to refuse medication, that medication is in his or her best interest to medicate voluntarily, that without it he or she presents a current risk of harm to self or others, and that there are not acceptable alternative means to address the dangerousness. More significantly, once the order is in place, the team implements it only after again being satisfied that those four criteria have been met. Administrative review occurs six months after the issuance of the order, regardless of whether the patient has been administered the medication, and annually thereafter. Further, the patient has the right to appeal the initial order to a circuit court and to appeal the

administrative reviews to an independent panel. In our view, those requirements adequately provide procedural due process protections to a patient who is subject to an order for involuntarily medication.[24]

3. As-Applied Challenge: Wis. Stat. § 971.17(3)(c) and AD-11–97 on Procedural Due Process Grounds

¶ 67. Wood does not develop a separate argument from his facial challenge that Wis. Stat. § 971.17(3)(c) is unconstitutional on procedural due process grounds as applied to him. He does not put forth any evidence that Mendota did not comply with the review provisions, as we identified them above, or that application of those review provisions to him is unconstitutional. Hence, we cannot conclude that the statute was applied unconstitutionally to him.

¶ 68. Likewise, Wood does not put forth any evidence that Mendota staff did not follow the protocol for seeking the order to medicate involuntarily or for review of that order as set forth in AD-11–97, or that application of that protocol to him would in any way violate his rights to procedural due process. The record contains evidence that the treatment team at Mendota properly did all that the directive required of it. Further, Dr. Smith testified that he and the nursing staff

---

[24] We note that both the statute and the directive contain both automatic and patient-initiated mechanisms for review. In Wis. Stat. § 971.17(4), review occurs when the physicians administer the medication in accordance with appropriate medical standards (automatic) and when the patient petitions for conditional release (patient-initiated). In AD-11–97, treatment team reviews occur after six months and then annually thereafter (automatic) and when the patient seeks either administrative or judicial review of the treatment team reviews (patient-initiated).

monitor a patient's reaction to medication on a daily basis. He stated that in Wood's case, Wood consistently identifies the side effects he experiences, the staff responds to those complaints, and the staff further regularly tests Wood's blood to ensure that he is not experiencing one rare, but serious, potential side effect that his particular medication may produce.

¶ 69. Accordingly, we are satisfied that neither Wis. Stat. § 971.17(3)(c) nor AD-11–97 violates procedural due process as applied to Wood.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

¶ 70. Wood also argues that the order should be vacated because his trial counsel provided ineffective assistance at the hearing regarding the forced medication order. To prevail on a claim for ineffective assistance of counsel, the challenging party must establish that trial counsel (1) performed deficiently, i.e., below an objective standard of reasonableness, and (2) that the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Johnson*, 133 Wis. 2d 207, 216–17, 395 N.W.2d 176 (1986). Wood asserts that his trial counsel's performance was deficient and prejudicial in three respects: (1) counsel failed to argue that Wis. Stat. § 971.17(3)(c) is unconstitutional; (2) counsel failed to obtain an independent psychological evaluation of Wood or discuss that possibility with Wood; and (3) counsel failed to make arrangements at the hearing that would have permitted Wood to consult with him confidentially. The State responds that Wood has failed to demonstrate, in all three respects, that counsel performed deficiently or that any deficient performance was prejudicial. We agree with the State.

¶ 71. First, we are satisfied that counsel's failure to raise the constitutional issue was not ineffective. We need not assess whether counsel performed deficiently in that respect. Given our conclusion herein that Wis. Stat. § 971.17(3)(c) does not violate substantive or procedural due process, Wood cannot show that the failure to raise such issues prejudiced him.

¶ 72. Second, trial counsel in this situation was not required to seek an independent psychological evaluation of Wood. At the hearing, Dr. Smith provided the only testimony; Wood's attorney cross-examined the doctor but did not seek to enter a written or testimonial independent evaluation of Wood at the hearing. Wood argues that trial counsel's failure to seek an independent evaluation, or at least consult with Wood regarding the possibility, was deficient performance.

¶ 73. It is within an attorney's discretion to call or not call a particular witness, if the circumstances of the case reasonably support such a decision. *See Whitmore v. State,* 56 Wis. 2d 706, 715, 203 N.W.2d 56 (1973); *see also State v. Wright,* 2003 WI App 252, ¶¶ 34–35, 268 Wis. 2d 694, 673 N.W.2d 386. As a general policy, we do not second-guess an attorney's discretionary decisions at trial, if those decisions were rational given the applicable law and the facts of the case. *State v. Felton,* 110 Wis. 2d 485, 502–03, 329 N.W.2d 161 (1983).

¶ 74. Here, the record strongly supports the inference that an independent evaluation would not have been a beneficial option for Wood. Past psychiatric reports in the record indicate that Wood frequently refused to speak with examining physicians or, when he chose to speak, would make inappropriate comments to the physicians. Moreover, the record indicates that Wood's behavior had grown worse in the months lead-

ing up to the hearing. Accordingly, counsel's decision to attack the Mendota evaluation rather than seek an independent evaluation appears reasonable. Further, we do not believe that, under those circumstances, counsel was deficient to the extent that he did not discuss the option to have an independent evaluation by a psychologist. Accordingly, Wood's counsel was not ineffective in that regard.

¶ 75. Third, and finally, we are satisfied that Wood's attorney was not ineffective for failing to provide for private communication with his client during the hearing. Wood appeared at the hearing by video conference and his attorney appeared in person. When offered an opportunity to testify, Wood remained silent. Later, Wood claimed that he had wanted to testify but did not do so because he could not privately consult with counsel. Wood asserts that counsel should have arranged for a separate phone line or some other arrangement to permit them to consult privately during the hearing. He invokes for support *Van Patten v. Deppisch,* 434 F.3d 1038, 1046 (7th Cir. 2006) (*Deppisch*), in which the Seventh Circuit Court of Appeals held that an attorney who appeared on speaker phone at the defendant's plea hearing presumptively provided ineffective assistance of counsel.

¶ 76. *Deppisch* offers no assistance here. In that case, the defendant, pursuant to 28 U.S.C. § 2254, collaterally challenged an unpublished Wisconsin Court of Appeals opinion in which that court held that the telephonic participation of the defendant's attorney at the plea hearing did not violate his right to counsel. The Seventh Circuit Court of Appeals reversed the Wisconsin Court of Appeals. *Deppisch,* 434 F.3d at 1041–42. However, in *Wright v. Van Patten,* 552 U.S. 120 (2008), the United States Supreme Court reversed the Seventh

Circuit's judgment in *Deppisch*. In so doing, the Supreme Court observed that its "precedents do not clearly hold that counsel's participation by speakerphone should be treated as a complete denial of counsel, on par with total absence." *Id.* at 125 (quotation marks omitted). The Court held that, based on the posture of the case, the Seventh Circuit Court of Appeals was not authorized to grant the defendant relief on the merits unless the state court's decision contradicted or was an unreasonable application of clearly established United States Supreme Court law. *See id.* at 125–26 (describing requirements for review in 28 U.S.C. § 2254(d)(1)).

¶ 77. Even if we were to determine that *Deppisch* offers any support to Wood's argument, Wood nevertheless fails to show that any alleged deficiency was prejudicial. He never requested, either before or during the hearing, an opportunity to confer privately with counsel. Wood further does not indicate what testimony he would have offered that, had he been given the chance to confer during the hearing, might have changed the outcome.[25]

¶ 78. In summary, Wood's ineffective assistance of counsel claim fails because he has not shown deficient performance or prejudice. The circuit court did not err in denying his motion in that regard.

---

[25] To clarify, we conclude that Wood's argument fails due to lack of prejudice. Because of that, we do not reach the important issue of what requirements the Sixth Amendment imposes on telephonic appearances to protect a defendant's ability to privately consult with counsel and how those requirements apply to the first prong of the *Strickland* analysis.

## VI. CONCLUSION

¶ 79. We are satisfied that Wis. Stat. § 971.17(3)(c) and AD-11–97 comport with the due process provisions of the Fourteenth Amendment to the United States Constitution and Article I, Section 1 of the Wisconsin Constitution for two reasons. First, we conclude that due process does not require a finding of dangerousness to issue an order compelling involuntary medication of a person committed under Wis. Stat. ch. 971. Even if due process required such a finding, there would be no violation because the statutory language of Wis. Stat. § 971.17(3)(c), along with AD-11–97, effectively provide for such a finding. Second, we conclude that due process requires periodic review of the compelled involuntary medication order, and that Wis. Stat. § 971.17(3)(c) and AD-11–97 satisfy that requirement as well. Additionally, we are satisfied that Wood did not receive ineffective assistance of counsel. Accordingly, we hold that Wis. Stat. § 971.17(3)(c), along with AD-11–97, comport with substantive and procedural due process facially and as applied here. We also affirm the circuit court's orders compelling involuntary medication and denying Wood's motion for relief from the involuntary medication order.

*By the Court.*—The orders of the circuit court are affirmed.

¶ 80. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I disagree with the majority opinion in three respects: (1) I conclude that a finding of present dangerousness is required. Section 971.17(3)(c) does not require this finding and therefore is facially unconstitutional as a matter of substantive due process. (2) I conclude, as does the majority opinion, that procedural due process requires periodic review of the medication

decision. Section 971.17(3)(c) does not provide periodic review of the medication decision. Accordingly, I conclude that the statute is facially unconstitutional as a matter of procedural due process. (3) I conclude that the Administrative Directive, a nonbinding internal statement of policy, cannot and does not repair the substantive and procedural constitutional defects of § 971.17(3)(c).

I

¶ 81. The majority opinion concludes that due process does not require a finding of dangerousness to issue an order compelling involuntary administration of antipsychotic medication to a person who is found not guilty of a crime by reason of mental disease or defect and who is incompetent to refuse medication or treatment. I disagree. I am persuaded by the reasoning of the federal district court in *Enis v. Department of Health & Social Services,* 962 F. Supp. 1192 (W.D. Wis. 1996), that a finding of present dangerousness is constitutionally required.[1]

¶ 82. All persons have a significant constitutionally protected liberty interest in avoiding the forced administration of antipsychotic medication. *Sell v. United States,* 539 U.S. 166, 178 (2003); *Riggins v. Nevada,* 504 U.S. 127, 134 (1992); *Washington v.*

_____

[1] Other statutes provide that dangerousness must be considered. Dangerousness is a consideration in involuntary commitment for treatment under Wis. Stat. § 51.20(1) and in commitments by the department of corrections under § 51.37(5)(b). Wisconsin's Patients' Rights law provides that patients have the right to refuse medication except, for example, in a situation in which the medication is necessary to prevent serious physical harm to the patient or to others. *See* § 51.61(1)(g)1.

372

*Harper,* 494 U.S. 210, 221, 229–30 (1990); *State v. Anthony D.B.,* 2000 WI 94, ¶ 27, 237 Wis. 2d 1, 614 N.W.2d 435; majority op., ¶ 25.

¶ 83. Only an "essential" or "overriding" state interest can overcome this liberty interest to permit the involuntary administration of antipsychotic medications. *Sell v. United States,* 539 U.S. 166, 178–79 (2003). Possible essential or overriding state interests are not set forth in the statute; the circuit court did not consider the state interest in the present case. If the state interest is the order and safety of the institution, the State must adduce evidence to support its contention that the person is dangerous to himself or to others within the setting of the institution. *See Sell,* 539 U.S. at 174, 178 (citing *Harper,* 494 U.S. at 222). As the court of appeals queried in its certification memorandum: "If, given the security controls in place at Mendota, Wood does not actually present a danger to himself or others in his current unmedicated state, exactly what interest does the State have in compelling him to take medication?" The State has not proved a state interest that meets the constitutional requirement.

¶ 84. Dangerousness has to be considered at the time the administration of the medication is requested. The determination that dangerousness can be inferred from prior proceedings, as the majority opinion argues, ¶¶ 35–37, is not, in my opinion, sufficient. Over seven years have passed since the defendant in the present case was sentenced/committed and the court determined he posed a risk of danger. The most recent circuit court denial of the defendant's petition for conditional release, including the finding that the defendant "would pose a significant risk of bodily harm to himself or others or of serious property damage if conditionally released," was almost three years before the present

373

proceedings involving involuntary medication. For a summary of the petitions (both before and after the one I describe) and their dispositions, see majority op., ¶ 7 & n.4.

¶ 85. Another aspect of substantive due process in weighing the legitimacy of the state's involuntary administration of antipsychotic drugs is the availability of less intrusive alternative treatments. *Sell,* 539 U.S. at 179, 181; *Riggins,* 504 U.S. at 135; *Harper,* 494 U.S. at 225; majority op., ¶ 24. The statute is silent about the consideration of alternatives. The circuit court, in authorizing involuntary medication, made no findings or determination about less intrusive alternative treatments.

¶ 86. For the reasons stated, I conclude that substantive due process requires a finding of present dangerousness to issue an order compelling involuntary administration of antipsychotic medications to a person found not guilty of a crime by reason of mental disease or defect and determined to be incompetent to refuse medication or treatment.

## II

¶ 87. The majority opinion concludes (¶¶ 4, 51) that procedural due process requires periodic review of the compelled involuntary medication order. I agree. Section 971.17(3)(c), however, contains no provision for such periodic review. The majority opinion does not establish a procedure for periodic review.

¶ 88. Rather, the majority opinion concludes that this procedural constitutional deficiency is rectified by two aspects of the statute: First, a committed person may petition for conditional release every six months and the court will hold a hearing upon such petition.

Majority op., ¶ 57. Second, the statutory requirement that medical professionals "observe appropriate medical standards" includes the concept of periodic review. Majority op., ¶¶ 58–59.

¶ 89. Thus, to fulfill the constitutional requirement of periodic review, the majority opinion puts the onus on an incompetent institutionalized person to request and pursue a hearing and on medical professionals whose concept of review for medical purposes may or may not be the same as the concept of periodic review for constitutional law purposes.

¶ 90. In my view, neither of these statutory provisions satisfies the procedural due process requirement of a periodic review.

## III

¶ 91. The majority concludes that any statutory constitutional deficiencies are remedied by an Administrative Directive and interprets the statutory requirement of "appropriate medical services" to require compliance with this Directive. The Administrative Directive is an internal statement of policy, not a rule or regulation of the Department.

¶ 92. This Administrative Directive was obviously adopted to comply with the *Enis* case. The majority opinion declares the *Enis* case is "unpersuasive" (majority op., ¶ 18). The continued viability of the Administrative Directive is problematic.

¶ 93. The court's obligation is to determine the constitutionality of a statute, not the constitutionality of an Administrative Directive.

¶ 94. For the reasons set forth, I dissent.

¶ 95. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.