COURT OF APPEALS
DECISION
DATED AND FILED

November 11, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP1665-CR**

Cir. Ct. No. **2013CF1394**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

CHESTER J. MASS,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Kenosha County:  CHAD G. KERKMAN, Judge.  *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Davis, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Chester J. Mass appeals from a judgment convicting him of first-degree intentional homicide,[1] and an order denying his postconviction motion seeking a new trial on grounds of ineffective assistance of counsel. Mass maintains that his trial counsel provided ineffective assistance by failing to retain an expert to counter the medical examiner's trial testimony. Because we conclude that trial counsel did not perform deficiently, we affirm.

¶2 The following facts are gleaned from the trial testimony. In the early morning hours of December 4, 2013, Mass killed his girlfriend, Heather Adamski, by shooting her once in the head. His brother, Justin, testified that he and Mass purchased guns earlier that evening. Justin fell asleep on the couch. Mass shook him awake and told him that Heather had been shot. They moved Heather's body. According to Justin, Mass said they would dispose of her corpse: "[W]e're going to chop her up, put her in the toilet, I will throw her in the creek, leave her outside of some drug dealer's house, do this, do that. What the heck." When Mass was not looking, Justin ran out of the house and called the police.

¶3 A police tactical team arrived and surrounded the house. Mass eventually left the house in police custody. He admitted shooting Heather but told police it was an accident. Lieutenant Bill Beth testified that before exiting the house, Mass said that Heather was performing oral sex and when they went to change positions, Mass took the gun out of her hand and it fired. He was not aware that the hammer was pulled back.

---

[1] Mass was also convicted of possessing a firearm as a felon. He does not challenge that conviction.

2

¶4    Sergeant James Beller was one of the officers who interrogated Mass. Mass told him that he wanted Heather to come over to have sex. He told Beller that he lied to Heather through phone and text messages, telling her he had a woman at the house and that he was boxing up Heather's clothes to throw away. Mass knew this would get Heather to come over quickly.

¶5    The interrogation was recorded. Mass told the officers that Heather came over and they went into the bedroom. They argued, engaged in sexual activity, and played with the guns. According to Beller, Mass said that after "they were done with the first portion of the sexual activity, they began to tussle over the handgun." Mass said that after Heather gave him oral sex, they changed positions to have intercourse from behind, with Heather kneeling in front of and facing away from Mass. During this transition, the handgun went off and Heather was shot in the back of the head. The videotaped interview shows Mass attempting to demonstrate this version of the shooting. It was played for the jury.

¶6    Milwaukee County Chief Medical Examiner Brian Peterson performed Heather's autopsy. Dr. Peterson testified that Heather died from a penetrating gunshot wound that entered the top of her skull about four and one-half inches above her left ear. The bullet traveled downward from the top of her head, moved slightly left to right, and lodged in her brain stem. He said the bullet's trajectory "was left to right and downward."

¶7    Mass's recorded interrogation was played for Peterson. He testified that Mass's estimate of the gun's distance from Heather's head was consistent with the evidence, but that the other circumstances Mass described were not:

> The way I understood that, what he's describing is somebody bending down in front. He's demonstrating the gun in his right hand pointing downwards and towards the

front. If you were to shoot somebody at that angle, not only would the entrance wound be in the back of the head, but given the angle the entrance wound would be lower, the bullet would end up higher towards the front. In this case the bullet did not move from back to front. It moved from left to right and it moved downward. And it came in from the left. So I can't make my arm—I'm trying to think if I could bend my arm in a position like that. It just doesn't work.

¶8 The prosecutor asked Peterson: "So if Chester Mass has the gun in his right hand and the way he's describing it Heather Adamski's in front of him facing away from him, is it possible for him to make this entry wound on the top left portion of her head?" Peterson answered, "No."

¶9 When asked if it was possible that Mass shot Heather by holding the gun in his right hand as she was kneeling in front of him and facing him,[2] Peterson answered "That would work." He agreed this would be consistent with the bullet's trajectory: "Because with the gun in his right hand, if she is kneeling facing him that puts the muzzle on the left side of her head. And if she is kneeling and he's a little bit higher, that would give you the downward angle. So that would work."

¶10 After the State rested, Mass informed the judge that he had discussed Peterson's autopsy findings with trial counsel. Mass said that his original trial attorney, Matthew Perz, had consulted with Dr. Robert Corliss about Mass's version of events as depicted in the recorded interrogation. In response, trial counsel said: "Attorney Perz talked to another forensic person. They did not support a different conclusion here. So I did not retain an expert for that reason." Additional facts will be discussed where relevant.

---

[2] The State ultimately argued that this is how the assault likely occurred.

¶11   Mass testified that the shooting was an accident. He said Heather was upset with him for paying too much for the guns. She started playing with the handgun, so he took it from her and set it down. She performed oral sex on him, and then picked the gun back up and pointed it at his penis, thinking it was funny. Mass told Heather to quit playing with the gun. He testified that the shot occurred when she grabbed the gun from him to pull it away. Heather booted him back and he booted her forward. The space was very tight and there was a television in front of her. Her face went towards the television and when he pulled the gun out of her hand, it went off.

¶12   The jury received instructions on first-degree intentional homicide and the included offense of first-degree reckless homicide. It found Mass guilty of the greater charge, first-degree intentional homicide.

¶13   After sentencing, Mass filed a postconviction motion alleging that trial counsel provided ineffective assistance "by not obtaining and presenting the opinion of an expert forensic pathologist who would have countered the centerpiece of the State's case, which was its theory that the forensic evidence . . . showed [Mass] lied to police and that the shooting occurred in a brutal and heinous manner." Attached was a report from Dr. Andrew Baker, a forensic pathologist, expressing concern over "how the autopsy findings were used in testimony to categorically exclude … *any* possibility that [Mass's] explanation of the positions of Ms. Adamski's and his bodies could be true." Baker opined that he "could picture a hypothetical position in which Ms. Adamski is in front of Mass, 'facing' away from him but with her head turned to the left and tilted upward, which could account for the bullet pathway in her head." Baker qualified his opinion: "This is not to say that I know (or necessarily even believe) this is what transpired, but rather to point out that such a scenario is not ruled out by the

5

autopsy findings." He concluded that "[t]he autopsy findings cannot categorically rule out the hypothetical positions of Mass and Ms. Adamski as portrayed in the police interrogation video, particularly if the position of Ms. Adamski's head at the time the weapon discharged cannot be known."

¶14 The circuit court held an evidentiary ***Machner***[3] hearing. Both Baker and trial counsel testified. Baker agreed with Peterson's opinions about the cause of death, range of fire, and that the wound trajectory was left to right and downward.[4] What Baker disagreed with was Peterson's willingness to opine that Mass's version of events as described in the recorded interrogation "just doesn't work." Instead, Baker opined: "Based on the autopsy findings I would not be able to categorically exclude his explanation as being possible."

¶15 Baker testified that forensic pathologists describe trajectories in terms of standard anatomic position, and that knowing a bullet's trajectory does not imply anything about the position of the victim's head. He explained that because the head can move in a nearly infinite number of directions, he believed he could not rule out Mass's version without knowing the exact position of Heather's head at the time she was shot. On cross-examination, Baker confirmed that whereas he had opined that Mass's explanation of the range of fire "was

---

[3] ***State v. Machner***, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) (where a defendant claims he or she received the ineffective assistance of trial counsel, a postconviction hearing "is a prerequisite … on appeal to preserve the testimony of trial counsel").

[4] Dr. Baker also stated that he had a minor disagreement about the entrance wound's exact location that equated to "probably a fraction of an inch." When asked about the significance of this difference, he said: "I don't know that there is any significance to it. I think at best it's a minor disagreement." This echoes Baker's report, which referred to any disagreement about the location of the entrance wound, or a "slight" back–to–front bullet trajectory, as "minor."

consistent with the autopsy assessment," he was not stating that Mass's explanation of how the shooting occurred was similarly "consistent" with the autopsy. His opinion was that "the autopsy cannot categorically rule out" Mass's recorded explanation. As far as the State's theory—that Heather was on the ground facing Mass when he shot her—Baker agreed that "the autopsy could be consistent with that scenario also."

¶16    Trial counsel testified that she and Mass disagreed over the theory of the case. According to trial counsel, Mass insisted that they "go with the idea that it was a purely accidental shooting. I didn't think that was a good theory. I thought it was more of a reckless shooting." Mass refused to allow trial counsel to try negotiating pleas to reckless homicide and only decided to request a lesser-included offense instruction on first-degree reckless homicide "right at the end of the trial."

¶17    Trial counsel testified that she considered the utility of hiring an expert forensic pathologist to assist the defense. She spoke with Mass's prior counsel, Attorney Perz, who had consulted with Corliss about the case, and she reviewed email correspondence between Perz and Corliss. Trial counsel explained that she, herself, had spoken with Corliss about other cases but could not remember whether she spoke to him directly about this case. She testified that Perz "seemed like an intelligent, reasonable person who had already done work on the case and seemed to know what he was doing. I spoke to him and I said do you think, you know, based on what you talked to Corliss about, is there any reason to pursue this? And basically, the answer to that question was no." She said that was part of the reason she decided not to hire an expert.

¶18    Trial counsel believed that the evidence did not support Mass's version of an accidental shooting, including his recorded explanation wherein Heather, having been knocked down by his pelvis, was facing away when the gun accidentally discharged.  Counsel did research and, with an associate's help, tried to recreate the shooting as Mass described it.  Trial counsel did not think a different forensic pathologist could have provided useful assistance because Mass never provided an explanation of the shooting that made sense in light of the evidence:

> Because if [Mass] isn't telling me some logical alternative way that it happened, then what is hiring an expert going to do?  I mean, you use experts in criminal cases where you have a theory of the defense that's well defined and now you're looking at someone to help support that.  You don't hire an expert to try to get the defendant to say something that something happened in a certain way.  In order to do that—I mean, when I hire experts in my own cases, I have a theory and then I'm looking to support that theory.
>
> Here Mr. Mass never was able to adequately explain how this shooting happened in terms of where that entrance wound is and where that exit wound is and the angle of which the bullet goes through her skull.  We tried to get him to demonstrate it.  He never was able to demonstrate it.  So what was an expert going to do to me?

¶19    Trial counsel explained that she had no reason to doubt Peterson's autopsy findings.  Her strategy was to show that "these doctors are unable to really say the exact position of people's bodies at the time that they're being shot," and "if they're examining it via the anatomical position and people move in space and time and unlike TV, … they're rarely able to say exactly how a gunshot occurred …."

¶20     The circuit court denied Mass's postconviction motion, finding that Baker's testimony would not have changed the outcome at trial.  The court also found that trial counsel did not perform deficiently.  Mass appeals.

## DISCUSSION

¶21     Mass maintains that trial counsel provided ineffective assistance by failing to hire an expert like Baker to testify at trial.  The test for ineffective assistance of counsel has two prongs:  (1) a demonstration that counsel's performance was deficient and (2) a demonstration that the deficient performance prejudiced the defendant.  ***Strickland v. Washington***, 466 U.S. 668, 687 (1984).  To establish deficient performance, a defendant must show specific acts or omissions of counsel that were "outside the wide range of professionally competent assistance."  ***Id***. at 690.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight … and to evaluate the conduct from counsel's perspective at the time."  ***Id***. at 689.  Thus, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  ***Id***. at 690.  To satisfy the prejudice prong, the defendant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  ***Id***. at 694.

¶22     Whether counsel's actions were deficient or prejudicial is a mixed question of law and fact.  ***Id***. at 698.  The trial court's findings of fact will not be reversed unless they are clearly erroneous.  ***State v. Pitsch***, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985).  However, whether counsel's conduct violated the

9

defendant's right to effective assistance of counsel is a legal determination, which this court decides de novo. *Id*. We need not address both prongs of the test if the defendant fails to make a sufficient showing on either one. *Strickland*, 466 U.S. at 697.

¶23 We conclude that trial counsel's decision not to hire a defense expert was objectively reasonable under the facts and circumstances of this case. Counsel was not necessarily required to consult with an independent expert. *See State v. Wood*, 2010 WI 17, ¶¶71-74, 323 Wis. 2d 321, 780 N.W.2d 63 (whether to consult an expert and whether or not to call an expert witness are discretionary decisions made by trial counsel). In considering whether trial counsel performed deficiently, we will not by hindsight reconstruct the "ideal defense." *State v. Harper*, 57 Wis. 2d 543, 556-57, 205 N.W.2d 1 (1973) (the test for effectiveness is much broader and a defendant is not entitled to the perfect or best defense, but only to one which under all the facts constitutes reasonably effective representation).

¶24 Here, it was perfectly reasonable for trial counsel to consult with Mass's prior attorney in investigating and evaluating the case. Trial counsel testified that she was familiar with Corliss and that she had seen the email exchange between Perz and Corliss. Based on her own experience and knowledge, she determined that Perz had performed relevant work and "seemed to know what he was doing." It was in that context that she evaluated Perz's opinion that a defense expert would not be helpful. Based on the information from Perz, as well as her own research and attempts to recreate Mass's story, counsel assessed the circumstances and made an informed decision not to focus her resources on seeking out a forensic expert to counter Peterson's autopsy findings,

which she had no reason to doubt. This is precisely the type of strategic decision we are loathe to second-guess.

¶25 Instead, trial counsel's strategy for addressing Peterson's testimony was to focus her cross-examination on the limits of what an autopsy can show, and what Peterson could actually glean from the autopsy. The record shows that counsel used this strategy, getting Peterson to agree, for example that in real life, bodies and guns are both in motion, making it "difficult to determine exactly how a person was shot," and giving rise to "lots of possibilities," and that he could not say where the body and gun were positioned at the time Heather was shot. Peterson explained:

> I only feel responsible for what happens when the bullet hits the body and I can describe where the entrance wound is and where the bullet ends up and so forth. That much I'm sure of. Anything beyond that, how the shooter was and so forth, I can answer perhaps a hypothetical question about that like here, but I don't have any certainty there. I wasn't there to watch.

¶26 The limited value of Baker's report also underscores the reasonableness of trial counsel's decision. First, some of the testimony she elicited from Peterson on cross-examination echoed points made by Baker, such as the inability of a forensic expert to account for three-dimensional positioning, and that their expert opinions are limited to answering whether hypotheticals are or are not consistent with the autopsy findings. Second, Baker's report is not nearly as helpful as Mass wants it to be. As Baker acknowledged, his autopsy findings are not materially different from Peterson's findings. And while Baker opined that the firing distance was consistent with Mass's explanation, Baker would not go so far as to agree with Mass's explanation of how the shooting occurred. Baker would have testified that Mass's version could not be categorically excluded, but that

Baker did not know or necessarily even believe that this is what transpired. Further, like Peterson, Baker would have agreed that the autopsy results "would also be consistent with" the State's theory of how the shooting occurred.[5]

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[5] Though we decide this case on the deficient performance prong, the limited value of Dr. Baker's opinion also suggests that trial counsel's performance was not constitutionally prejudicial. Here, we further observe that the State's closing argument centered on circumstantial evidence of Mass's intent, not on Dr. Peterson's testimony. Additionally, Peterson did not opine about Mass's state of mind, or suggest that the shooting was intentional rather than accidental.