COURT OF APPEALS
DECISION
DATED AND FILED

August 21, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2125**

STATE OF WISCONSIN

Cir. Ct. No. 2023CV676

IN COURT OF APPEALS
DISTRICT IV

THOMAS KRUPENKIN,

    PETITIONER-APPELLANT,

 V.

JENNIFER MNOOKIN,

    RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Dane County: SUSAN M. CRAWFORD, Judge. *Affirmed*.

Before Graham, P.J., Kloppenburg, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Thomas Krupenkin appeals a circuit court order that affirmed a disciplinary decision by Jennifer Mnookin, who is the chancellor of the University of Wisconsin-Madison.  In that decision, the university suspended Krupenkin's employment for two years without pay for violating a policy that required him to disclose certain inventions to the university.  Krupenkin argues that his constitutional right to due process was violated during the course of the disciplinary proceedings, and that the invention-disclosure policy is unconstitutionally vague.  We reject Krupenkin's arguments and affirm.

## BACKGROUND

¶2     The events that gave rise to this appeal began when Krupenkin, a tenured professor of engineering at UW-Madison, did not disclose two inventions that he patented at a time that he was employed by the university.  The subject of the disciplinary proceedings was whether Krupenkin's failure to disclose these inventions violated a UW System policy.

¶3     The invention-disclosure policy at issue provides: "All inventions discovered by faculty … on appointment while pursuing their university duties, or on university premises, or with university supplies or equipment must be reported" to UW-Madison using an invention-disclosure report form created by the Wisconsin Alumni Research Foundation (WARF).  UW SYS. ADMIN. POL'Y § 1315 (through June 17, 2025), https://www.wisconsin.edu/uw-policies/uw-system-administrative-policies/inventions-and-patents/.   The policy further provides that upon disclosure, inventions will be subject to an "equity review" to determine the faculty member's rights in the invention.  § 1315.  A related policy provides: "Except as required by funding agreements, other contractual agreements with third parties such as material transfer agreements, or other

University policies, the University does not claim ownership rights in the intellectual property generated during research by its faculty, staff, or students." UW-MADISON ADMIN. POL'Y § 4008 (through July 12, 2022), https://policy.wisc.edu/library/UW-4008.[1]

¶4    The facts giving rise to the disciplinary proceedings came to light during a post-tenure review that occurred in 2019.  During that review, Krupenkin identified a number of inventions that he had patented as evidence of his scholarly productivity.  However, Krupenkin had not disclosed some of these inventions to UW-Madison, which led the university to commence disciplinary proceedings against him.

¶5    Disciplinary proceedings of this type are governed by the "Faculty Policies and Procedures" for UW-Madison.  Pursuant to those procedures, the disciplinary proceeding begins with the filing of a formal written complaint.  *See* UW-MADISON ADMIN. POL'Y (FPP) § 9.04, https://secfac.wisc.edu/policies/.[2]  If the provost determines that the allegations in the complaint may have merit and warrant discipline, FPP § 9.05, there are multiple levels of proceedings and appeals that may follow.  First, an investigator appointed by the provost conducts an investigation and issues recommendations.  FPP § 9.06.  Then, the provost consults with a disciplinary committee and issues an initial disciplinary decision. FPP § 9.06.  If the faculty member chooses to appeal, the faculty member may request a factfinding hearing before the Committee on Faculty Rights and

---

[1] All references to the UW-Madison Administration Policies are to the July 2022 register.

[2] A copy of these procedures is found in the administrative record compiled by the chancellor.  Henceforth, we cite to the Faculty Policies and Procedures as "FPP."

Responsibilities (the "Faculty Committee" or, sometimes, just the "Committee"). FPP §§ 9.07, 9.08, 9.09. Following the hearing, the Faculty Committee will issue findings of fact and recommendations, which it will submit to the chancellor, and the faculty member can file written objections with the chancellor. FPP § 9.11. The chancellor's decision is the final decision of the university, WIS. ADMIN. CODE UWS § 6.01(5),[3] and it is the decision that is subject to judicial review should an aggrieved party seek it.

¶6      Here, the written complaint alleged that Krupenkin "appear[ed] to have intentionally disregarded his obligations under [UW-System] policy to disclose inventions arising from his university duties."[4]  The complaint was referred to the provost, who determined that the allegations, if true, amounted to a prima facie case "for discipline or dismissal." *See* FPP §§ 9.05-9.06 (providing that complaints shall be referred to the provost, who "shall determine" whether "a prima facie case exists for the imposition of discipline or dismissal").

¶7      The provost then appointed a professor, Paul Ahlquist, to investigate the allegations in the complaint and notified Krupenkin of his right to object to the appointment. *See* FPP § 9.06 (providing that the provost "shall institute an investigation by appointing an investigator," and the faculty member "can state objections" to the investigator). Krupenkin did not object. Krupenkin was also

---

[3] All references to the Wisconsin Administrative Code are to the July 2025 register, and all references to the Wisconsin Statutes are to the 2023-24 version.

[4] The complaint also alleged other violations, specifically that Krupenkin failed to comply with his conflict-of-interest management plan; that he used university resources for the benefit of external private activities; that he misrepresented his productivity during the post-tenure review process; and that he improperly characterized his private entity's funds. We do not discuss these allegations further because they are not pertinent to our resolution of this appeal.

notified of his right to meet with the provost, and his right to be advised and represented by legal counsel. He was provided with "a written statement of the matter(s) to be investigated" and "a copy of the original complaint." *See* FPP § 9.06 (discussing the rights of faculty members at this stage of the disciplinary proceedings).

¶8      Ahlquist conducted an investigation over the next several months and eventually submitted his conclusions in the fall of 2020. As part of the investigatory process, Ahlquist scheduled an interview with Krupenkin to "seek his input on major issues emerging from [the] investigation," which resulted in Ahlquist engaging in additional investigation and analysis. Ultimately, Ahlquist determined that Krupenkin had violated the invention-disclosure policy by failing to disclose two energy-harvesting inventions that he had patented in 2012 and 2017 respectively.

¶9      The most significant factual dispute was whether Krupenkin discovered the inventions at issue while he was pursuing his university duties, or whether the inventions were derived from Krupenkin's personal inspirations and separable from his university research on the same topics, as Krupenkin asserted. Ahlquist concluded that Krupenkin discovered these inventions while he was pursuing his university duties. To that end, Ahlquist noted that Krupenkin had researched and published articles about energy harvesting as part of his university research program, and that this work, which predated Krupenkin's patent filings, had occurred on university premises. Ahlquist determined that the conclusions from Krupenkin's university research on energy harvesting substantially overlapped with the inventions that Krupenkin later patented. Based on this "close[] overlap," Ahlquist found Krupenkin's assertions about his inventions—that they were derived "solely from his personal inspirations" and "clearly

separable from his own thinking on the same topics within his UW program"—to be "remarkable."[5]

¶10   Following Ahlquist's investigation, the provost convened a committee to "advise the provost as to the actions that should be taken," if any, with respect to Krupenkin's misconduct.   *See* FPP § 9.06.B.   The provost ultimately issued a disciplinary decision that placed Krupenkin on unpaid leave for two years.  The decision also provided that he would be subject to oversight for a number of years following his return.

¶11   After the provost's decision was issued, Krupenkin was advised of his right to participate in voluntary and confidential settlement negotiations, as well as his right to appeal.  *See* FPP § 9.06.  Krupenkin elected to appeal his charges to the Faculty Committee.

---

[5] More specifically, as to the first undisclosed invention, Krupenkin published an article in 2011 about a "vibrational energy harvester," which was "a novel mechanical-to-electrical energy conversion method achieved through the interaction of arrays of moving microscopic liquid droplets with novel nanometer-thick multilayer dielectric films." Krupenkin published this article in affiliation with UW-Madison, and he conceded that its contributions to the field were based on research that he conducted on UW-Madison premises.  The following year, Krupenkin filed a patent application for a "vibrational energy harvester."  Like the 2011 article, the 2012 application described "[a]n apparatus comprising a mechanical-to-electrical energy converting device [that] utilizes an array of microfluidic droplets in association with a planar electrode separated by a dielectric layer."

The second undisclosed invention concerns research that Krupenkin began around July 2015.  The research was conducted with UW-Madison students in UW-Madison facilities, and specifically concerned "[m]echanical energy harvesting using a liquid metal vortex magnetohydrodynamic generator."  An article that Krupenkin authored with UW-Madison students about this research stated that "[a]nother way of thinking about the vortex MHD generator is as a homopolar generator with a liquid rotor rather than a solid one."  (Footnote omitted.)  Krupenkin filed a provisional patent application in 2016, which related to a "'liquid rotor' based magneto-hydro-dynamic (MHD) harvesting device."  Then in 2017, Krupenkin filed a standard patent application concerning a "[m]echanical energy harvesting utilizing liquid rotor homopolar generator."

¶12    The Faculty Committee is UW-Madison's "standing committee" that "[d]eals with allegations of faculty misconduct" and "[s]erves as the hearing committee" in discipline and dismissal cases.  *See* WIS. ADMIN. CODE § UWS 4.03; FPP §§ 6.38, 9.07.  The Faculty Committee is comprised of nine faculty members who are elected by the faculty at large.  FPP § 6.38.  It must contain at least one faculty member from each of UW-Madison's four faculty divisions (biological sciences, arts and humanities, physical sciences, and social sciences) and no more than three members from a single division.  FPP § 6.38.

¶13    When a faculty member appeals a disciplinary action to the Faculty Committee and requests a factfinding hearing, the Committee shall conduct a hearing to determine whether the discipline that the provost imposed was warranted.  *See* FPP §§ 9.07, 9.09.  The Committee's factfinding hearing must comply with WIS. ADMIN. CODE §§ UWS 4.05-4.06, which address "due process" requirements and "procedural guarantees" afforded to the faculty member facing discipline.  *See* FPP § 9.08.  Among other things, a "fair hearing" "shall include" service of written notice of the hearing on the specific charges; the right to names of witnesses and access to documentary evidence that will be used against the faculty member; the right to be heard in defense to the charges; the right to counsel and to offer witnesses; and the right to confront and cross-examine adverse witnesses.  *See* § UWS 4.05.  The burden of proof at the factfinding hearing rests with the university, *see* § UWS 4.06(1)(a), and the Committee must find that the university has shown "just cause for the imposition of discipline" by "clear and convincing evidence," *see* FPP § 9.09.

¶14    Turning back to the matter at hand, Krupenkin requested a factfinding hearing, and a hearing was scheduled.  Prior to the hearing date, the Faculty Committee advised Krupenkin that a panel of five of its nine members

would preside at his hearing. Krupenkin objected to the five-member hearing panel, arguing that the Wisconsin Administrative Code, UW-Madison polices, and due process required that the nine members of the Committee all be on the panel. Krupenkin specifically noted FPP § 6.38, which sets forth the composition of the Committee and further provides that the Committee is required to select replacements if "any members" of the Committee are disqualified from a "particular hearing." Read together, Krupenkin argued, these provisions "do not allow for the Committee to select a lesser number of its members to hear any particular matter."

¶15 The Faculty Committee gave UW-Madison's office of legal affairs an opportunity to address Krupenkin's objection. The office did not take a position on the merits of the objection, but requested that the Committee explain how a five-member panel "aligns with" the Wisconsin Administrative Code and UW-Madison's policies.

¶16 The Faculty Committee ultimately denied Krupenkin's objection, explaining that a five-member panel is consistent with the Committee's established internal procedures, which provide that "[a] hearing panel of 5 or more [Faculty Committee] members" can preside at any given hearing.[6] The Faculty

---

[6] As we discuss in more detail below, another of the Faculty Committee's internal procedures states that "[a] quorum of the [C]ommittee exists when six or more members … are present." The Committee did not address whether the five-member hearing panel was consistent with this procedure.

Committee also took the position that the five-member panel was consistent with the Wisconsin Administrative Code and UW-Madison's policies.[7]

¶17     Krupenkin's disciplinary hearing was held in December 2022.  Five members of the Faculty Committee were on the hearing panel, and none were from Krupenkin's faculty division.  UW-Madison presented a number of witnesses including Ahlquist, who discussed the conclusions of his investigation, and several UW-Madison and WARF officials, who discussed their understanding of the invention-disclosure policy.  Krupenkin had the opportunity to cross-examine these witnesses, to be heard in defense of the charges, and to present his own witnesses.  He was represented by counsel throughout the hearing.

¶18     With respect to the alleged violations of the invention-disclosure policy, Krupenkin's primary defense was that he did not discover his inventions while he was pursuing his university duties.  Krupenkin testified that his inventions are "conceptual" and sometimes "just come[] in a flash" on his personal time.  As we understand this testimony, Krupenkin appeared to be taking the position that, even if the inventions were related to his work at UW-Madison, any inventions that he conceptualized on his own time are separate and distinct from that work.  Therefore, Krupenkin contends, such inventions cannot be considered to have been discovered "while pursuing … university duties." *See* UW-MADISON ADMIN POL'Y § 4008.

---

[7] Among other things, the Committee noted that FPP § 6.38 addressed "the composition" of the Faculty Committee.  The Committee appeared to suggest that, although FPP § 6.38 required that the Committee contain nine members, it did not necessarily require that all nine members preside at any given hearing.  The Committee further noted that the disqualification-and-replacement provision in FPP § 6.38 that Krupenkin had referenced "can be read" to require replacement only "if there are insufficient members … (i.e., less than five) available to sit on a particular hearing."

¶19    After several days of testimony, the hearing panel issued its findings of fact and recommendations, in which it unanimously determined that there was just cause for disciplining Krupenkin for failing to comply with the invention-disclosure policy.  In its findings, the panel wrote that Krupenkin's "UW-Madison duties include engaging in scholarship and research related to the field of mechanical engineering[]" and that "[t]his work has considerable overlap with at least some of … Krupenkin's 'conceptual' inventions."

¶20    The findings and recommendations were transmitted to the chancellor, Mnookin.  After considering Krupenkin's objections, Mnookin issued a final decision, in which she upheld the provost's initial decision to place Krupenkin on unpaid leave for two years.

¶21    Krupenkin filed a petition in the circuit court seeking judicial review of the decision.  *See* WIS. STAT. § 227.52 ("Administrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form, are subject to review as provided in this chapter[.]").  He argued that the decision should be reversed because the five-member hearing panel violated his due process rights, and because the university's invention-disclosure policies were unconstitutionally vague.  The court rejected these arguments and affirmed the decision.  Krupenkin appeals.[8]

---

[8] The respondent's brief does not comply with WIS. STAT. RULE 809.19(8)(bm), which addresses the pagination of appellate briefs.  *See* RULE 809.19(8)(bm) (providing that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover").  This rule has recently been amended, *see* S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021), and the reason for the amendment is that briefs are now electronically filed in PDF format, and are electronically stamped with page numbers when they are accepted for efiling.  The pagination requirements ensure that the numbers on each page of a

(continued)

**DISCUSSION**

¶22    Under WIS. STAT. ch. 227, we review the decision of the agency, not the decision of the circuit court. *Wisconsin Pro. Police Ass'n v. WERC*, 2013 WI App 145, ¶10, 352 Wis. 2d 218, 841 N.W.2d 839. Krupenkin "bears the burden of demonstrating that the agency decision should be modified or set aside." *Bethards v. DWD*, 2017 WI App 37, ¶16, 376 Wis. 2d 347, 899 N.W.2d 364. Whether due process requirements are violated constitutes questions of law that we review de novo. *City of South Milwaukee v. Kester*, 2013 WI App 50, ¶13, 347 Wis. 2d 334, 830 N.W.2d 710. Vagueness challenges are a subset of due process claims, *Cemetery Services v. DRL*, 221 Wis. 2d 817, 829, 586 N.W.2d 191 (Ct. App. 1998), and are also reviewed under the de novo standard of review.

¶23    We address Krupenkin's due process arguments about the five-member panel and vagueness in that order.

**I.  The Faculty Committee Hearing**

¶24    The Due Process Clause of the Fourteenth Amendment protects the property interests of tenured public employees. *Arneson v. Jezwinski*, 225 Wis. 2d 371, 393, 592 N.W.2d 606 (1999); *Marder v. Board of Regents of Univ. of Wis. Sys.*, 2004 WI App 177, ¶30, 276 Wis. 2d 186, 687 N.W.2d 832 (*Marder I*). Accordingly, before tenured public employees may be deprived of their employment, they are entitled to certain procedural protections. *See Marder I*, 276 Wis. 2d 186, ¶¶30-31. In considering what process is due under

---

brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief. Supreme Court Note, 2021, RULE 809.19.

these circumstances, courts balance the following interests: the public employee's interest in "retaining employment"; the government interest in avoiding "administrative burdens" and securing the "expeditious removal of unsatisfactory employees"; and "the risk of erroneous termination." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542-43 (1985) (citing *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)); *see also Arneson*, 225 Wis. 2d at 403-404.

¶25 Here, Krupenkin argues that due process required that he receive a hearing in front of the full Faculty Committee before UW-Madison could suspend his employment for two years. We are not persuaded.

¶26 The Supreme Court's decision in *Loudermill* is instructive on this point. *See Loudermill*, 470 U.S. at 532. There, the Court considered the constitutional due process protections that must be afforded to a tenured public employee facing termination. *Id.* The Court determined that in this context, due process requires only that the employee receive "oral or written notice of the charges," "an explanation of the employer's evidence," "some kind of hearing," and "an opportunity … to present [the employee's] side of the story." *Id.* at 542, 546; *see also Marder I*, 276 Wis. 2d 186, ¶31 (citing *Loudermill*). Although the Court acknowledged "the significance of the [employee's] interest in retaining employment" and "the severity of depriving a person of the means of livelihood," *Loudermill*, 470 U.S. at 543, it reasoned that "[t]o require more than [these protections] prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing the unsatisfactory employee," *id.* at 546.

¶27 Accordingly, contrary to Krupenkin's argument, nothing in *Loudermill* suggests that Krupenkin was entitled to a hearing panel of any specific

composition or of a specific quantity of persons as a matter of constitutional due process. And Krupenkin does not argue that the due process protections that the university provided to him were somehow inconsistent with those outlined in *Loudermill*.

¶28 The record instead shows that the due process provided to Krupenkin was robust and satisfied all constitutional prerequisites. As discussed above, the disciplinary process began with Krupenkin receiving notice of the charges against him and a copy of the written complaint. The allegations in the complaint were then subject to an investigation, and Krupenkin was given the opportunity to be represented by counsel, to object to the university's choice of investigator, and to provide his side of the story to that investigator. After the investigation's conclusion, Krupenkin had a right to engage in settlement negotiations or to appeal the suspension decision. Krupenkin exercised his right to appeal and had a factfinding hearing, where he again had the right to and was represented by counsel. During the course of the hearing, Krupenkin had a right to access a list of the university's witnesses and documentary evidence; he had the opportunity to confront and cross-examine the university's witnesses; and he had the opportunity to present his own witnesses and defense. The hearing panel was required to provide Krupenkin with a written decision detailing its findings, and could find "just cause" for discipline only if the findings were "based on clear and convincing evidence in the hearing record." *See* FPP § 9.09.

¶29 Under these circumstances, we conclude that the risk of an erroneous employment decision was minimal, and we are not convinced that constitutional due process required any additional protection that the full Faculty Committee presiding at Krupenkin's hearing would provide. *See **Loudermill***, 470 U.S. at 543.

¶30      Krupenkin makes several arguments to the contrary, but none are persuasive.  He appears to be arguing that a hearing before a smaller subset of the Faculty Committee violated his right to a "fair hearing" before a "fair tribunal."  To this end, he cites our supreme court's decision in *Marder II*, and specifically, the language from that decision stating that "a basic element of constitutional due process … is a fair hearing conducted before a fair tribunal."  *Marder v. Board of Regents of Univ. of Wis. Sys. (Marder II)*, 2005 WI 159, ¶27, 286 Wis. 2d 252, 706 N.W.2d 110.  He points out that none of the members of the hearing panel were from his own faculty division, and he argues that that omission was "crucial[]" because "[h]aving members from each [d]ivision assures … that there is a fair representation of the unique perspectives each division may have."

¶31      We agree that it can be beneficial to have diverse perspectives represented in decisionmaking bodies.  However, this does not mean that the size or composition of Krupenkin's hearing panel resulted in the hearing or tribunal being unfair.  Krupenkin does not cite any authority for the proposition that a "fair hearing" or a "fair tribunal" would require a certain composition or quantity of decisionmakers in an administrative proceeding like this.

¶32      To the contrary, the case law appears to focus on whether the decisionmakers were "impartial," whether there was "bias or unfairness in fact," and, in limited circumstances, whether the "risk of bias [was] impermissibly high."  *Marder II*, 286 Wis. 2d 252, ¶27 (citations omitted); *see also Withrow v. Larkin*, 421 U.S. 35, 46 (1975).  Administrative adjudicators, including the members of the Faculty Committee who were on the hearing panel, "retain a presumption of honesty and integrity" and, "absent 'a showing to the contrary, [they] are assumed to be [individuals] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'"  *Marder II*,

286 Wis. 2d 252, ¶29 (citations omitted). Krupenkin does not point us to anything in the record that would overcome that presumption.

¶33 Krupenkin next cites to various provisions found in the Wisconsin Administrative Code and UW-Madison's Faculty Policies and Procedures, and he argues that these provisions definitively provide that he had the right to a factfinding hearing before all nine members of the Faculty Committee. We disagree for at least two reasons. First, Krupenkin does not identify any authority that supports the proposition that a violation of an administrative code provision or university policy amounts to a constitutional due process violation. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (a court need not consider arguments that are unsupported by legal citations or are otherwise undeveloped). Second, as we now explain, Krupenkin does not persuade us that the five-member panel violated any of the administrative code provisions or the UW-Madison policies that he cites.

¶34 As for the Wisconsin Administrative Code, Krupenkin cites five different provisions, but none of these provisions support his argument. *See* WIS. ADMIN. CODE § UWS 2.02 (Delegation); WIS. ADMIN. CODE § UWS 4.03 (Standing faculty committee); WIS. ADMIN. CODE § UWS 4.04 (Hearing); WIS. ADMIN CODE. § UWS 4.05 (Adequate due process); WIS. ADMIN. CODE § UWS 4.06 (Procedural guarantees). That is, none of these provisions state that the entire Faculty Committee must participate in a factfinding disciplinary hearing. *See* § UWS 2.02 (providing that rules that are developed by faculty must be approved by the board "prior to their taking effect"); § UWS 4.03 (providing that each institution shall have a "[s]tanding faculty committee" that is "charged with hearing dismissal cases and making recommendations under this chapter"); § UWS 4.04 (providing the timeline for faculty disciplinary hearings); § UWS

15

4.05 (discussing the requirements of "[a]dequate due process" for a "faculty member whose dismissal is sought," but not stating any requirements with respect to the composition of the hearing body); § 4.06 (discussing "[p]rocedural guarantees" that "[a]ny hearing held shall comply with," which does not include any requirement related to the composition of the hearing body).

¶35    The same is true with respect to the UW-Madison Faculty Policies that Krupenkin cites.  Although these policies provide that the Faculty Committee must be comprised of nine members, none of the policies state that all nine members of the Committee must participate in factfinding disciplinary hearings. *See* FPP § 6.38 (providing that the Faculty Committee's membership shall have nine seats "elected by the faculty at-large," with at least one member from each division; and that when a member is disqualified for a "particular hearing," a replacement shall be selected); FPP § 9.07 (providing that the Committee shall conduct a factfinding hearing when a faculty member appeals a disciplinary hearing); FPP § 9.08 (providing that a faculty member "shall have a right to … [b]e heard by all bodies passing judgment or making recommendations"); FPP § 9.09 (providing that a Committee finding that discipline is warranted "requires a majority vote with not more than two dissenting votes").

¶36    Krupenkin's argument to the contrary zeroes in on two of the above-mentioned UW-Madison policies, FPP §§ 6.38 and 9.09.  He appears to suggest that these policies are patently inconsistent with a hearing panel that consists of anything less than nine members.  We are not persuaded.

¶37    The first UW-Madison policy is the disqualification policy, which, as mentioned, provides that "if any member" of the Faculty Committee is disqualified for "a particular hearing," that member "shall be" replaced.  *See* FPP

§ 6.38. However, the fact that a disqualified Committee member must be replaced does not necessarily mean that a hearing panel must contain a total of nine members. As the Faculty Committee interpreted the policy, the policy merely provides that if a Committee member is disqualified from a hearing—whether the hearing panel was comprised of nine members or five members—that member must be replaced. This interpretation is not clearly erroneous. *Pfeiffer v. Board of Regents of Univ. of Wis. Sys.*, 110 Wis. 2d 146, 154-57, 328 N.W.2d 279 (1983) (concluding that a university committee's interpretation of the university's own policies and procedures is "entitled to controlling weight unless inconsistent with the language of the [policy] or clearly erroneous" (citation omitted)).

¶38 The second UW-Madison policy that Krupenkin directs us to is the majority vote provision, which provides that a finding by the Faculty Committee for discipline "requires a majority vote with not more than two dissenting votes." *See* FPP § 9.09. Again, this policy does not necessarily mean that a nine-member hearing panel is required. Both a five-member panel and a nine-member panel could comply with the requirement that there be a "majority vote with not more than two dissenting votes."

¶39 At best, Krupenkin is able to identify a potential conflict between two provisions in the Faculty Committee's own internal procedures, and to argue that a five-member hearing panel may be inconsistent with one of these two provisions. Although the Committee's internal procedures explicitly provide that the Committee can conduct a factfinding hearing with just five members, those same procedures also provide that "[a] quorum of the [C]ommittee exists when six

17

or more members of the [C]ommittee are present."[9] According to Krupenkin, "[i]t is axiomatic that a quorum is necessary for any committee … to conduct its business[,]" and he argues that here, business requiring a quorum should include factfinding hearings.

¶40 It is not at all clear that the provision about quorums in the Faculty Committee's internal procedures applies to disciplinary factfinding hearings.[10] Yet, even if we were to assume that it does, and that the Committee violated its own quorum procedures by having fewer than six members on Krupenkin's hearing panel, it does not follow that Krupenkin would be entitled to relief from this court. This is a WIS. STAT. ch 227 review of an administrative decision, and WIS. STAT. § 227.57(4) provides that a court shall not remand a case for further action based on an agency's failure to follow a "prescribed procedure" when the "fairness of the proceedings or the correctness of the action" was not impaired. Here, as discussed, we are not persuaded that a five-member panel impaired the "fairness of the proceedings or the correctness of the action."

¶41 Accordingly, for all of these reasons, we conclude that Krupenkin has failed to meet his burden to show that UW-Madison violated his due process

---

[9] We note that the provision in the Faculty Committee's internal procedures regarding a quorum also appears to be inconsistent with UW-Madison's policies, which state that "a quorum exists when a majority of the voting members of a committee is present." *See* FPP § 6.10. Here, a majority of the Committee would be five members, not six. For purposes of this appeal, we need not resolve any discrepancy between the quorum provision in the Committee's internal procedures and UW-Madison's quorum policy; we merely note UW-Madison's quorum policy because the circuit court's decision rested in part on that FPP provision.

[10] Generally speaking, "in the event of 'a conflict between a general and a specific statute,'" the more specific statute controls. *See **Belding v. Demoulin**,* 2014 WI 8, ¶17, 352 Wis. 2d 359, 843 N.W.2d 373 (citation omitted). Here, the Faculty Committee's internal procedure about the minimum number of members that must participate in a hearing panel is the more specific of the two internal procedures.

rights when it conducted his factfinding hearing with only five members of the Faculty Committee.

## II. The Invention-Disclosure Policy

¶42 We now turn to Krupenkin's argument that the invention-disclosure policy is unconstitutionally vague. It appears that Krupenkin is making a facial challenge to the invention-disclosure policy as well as an as-applied challenge. However, because we conclude that the policy is not unconstitutionally vague as applied to Krupenkin, we need not address the facial challenge. *See State v. Wood*, 2010 WI 17, ¶44 n.15, 323 Wis. 2d 321, 780 N.W.2d 63 (courts "look to the application of the challenged law or action to the challenger before considering hypothetical applications" and need only reach facial challenges when the challenger demonstrates "that the directive [is] impermissibly vague as applied to [the challenger]").

¶43 "Vagueness is a procedural due process concept which is driven by notions of fair play." *Cemetery Servs.*, 221 Wis. 2d at 829. An administrative policy is unconstitutionally vague when the policy does not provide "'fair notice' of the prohibited conduct." *Id.*; *see also State ex rel Kalt v. Board of Fire & Police Comm'rs*, 145 Wis. 2d 504, 510, 427 N.W.2d 408 (Ct. App. 1988) (a policy is vague if "[people] of common intelligence must necessarily guess [as to] its meaning and differ as to its application").[11]

---

[11] The vagueness rule "applies to administrative regulations affecting conditions of governmental employment in the same manner as it applies to penal statutes." *State ex rel Kalt v. Board of Fire & Police Comm'rs*, 145 Wis. 2d 504, 510, 427 N.W.2d 408 (Ct. App. 1988).

¶44 In an as-applied challenge to the vagueness of a law or policy, we assess "the merits of the constitutional claim by considering the facts of the particular case, not hypothetical facts in other situations." *See State v. Grandberry*, 2018 WI 29, ¶34, 380 Wis. 2d 541, 910 N.W.2d 214. The question is whether the policy provides "fair notice" to "a person of ordinary intelligence" in Krupenkin's situation that the person's conduct violates the invention-disclosure policy. *See id.*

¶45 Here, we conclude that a person of ordinary intelligence in Krupenkin's situation would have had fair notice that the person's conduct violated the invention-disclosure policy. In doing so, we defer to the Faculty Committee's findings of fact, as well as the weight that the Committee gave to the evidence presented at the factfinding hearing. *See* WIS. STAT. § 227.57(6) ("[T]he court shall not substitute its judgment for that of the agency as to the weight of evidence on any disputed finding of fact. The court shall, however, set aside agency action … if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.").

¶46 Based on the Faculty Committee's findings of fact, there is no doubt that Krupenkin's conduct fell squarely within the invention-disclosure policy. As mentioned, the policy requires that faculty disclose all inventions "discovered … while pursuing their university duties, or on university premises, or with university supplies or equipment." UW-MADISON ADMIN POL'Y § 4008. The Committee found that, as part of Krupenkin's "university duties," he was to engage "in scholarship and research related to [the] field of mechanical engineering," and that the two inventions that Krupenkin failed to disclose were "a product" of these duties. This finding was based on there being "considerable overlap" between energy-harvesting research that Krupenkin conducted in affiliation with UW-

Madison and with UW students on UW-Madison premises, and two energy-harvesting inventions that Krupenkin later patented but failed to disclose. A person of ordinary intelligence in Krupenkin's situation would have had fair notice that failing to disclose inventions that arose from the person's university research program and that were based on research conducted with university students on university premises would have violated the invention-disclosure policy.

¶47 Krupenkin disputes this conclusion for two reasons, both of which are unpersuasive. He first argues that, although the policy covers faculty inventions discovered "while pursuing their university duties, or on university premises, or with university supplies or equipment," certain university officials have interpreted the policy more broadly, for instance, to cover any invention that arises "during the course of employment."[12] Krupenkin asserts that this interpretation is inconsistent with the language of the policy because a professor may have an "'aha' moment" about an invention "at home, or on the beach" and that discovery could have "nothing" to do with the professor's research or university duties.

¶48 The scenario Krupenkin describes presents interesting questions that could arise in other cases. However, the fact that certain "proscriptions" of the

---

[12] Specifically, Krupenkin points to the testimony of three witnesses at the factfinding hearing: an intellectual property disclosure manager at UW-Madison; the chief intellectual property and licensing officer at WARF; and the dean of the college of engineering at UW-Madison. Among other things, Krupenkin points out that the intellectual property disclosure manager testified that the "preferred process" is for faculty members to disclose all inventions discovered during the term of employment, and the WARF officer testified that he could not think of a scenario in which a faculty member would not have an obligation to disclose if the faculty member believed the faculty member had come up with "something" that was an invention. Krupenkin also argues that the engineering dean testified that faculty members have "a duty to disclose any invention," but Krupenkin takes this testimony out of context.

invention-disclosure policy have the potential to be unconstitutionally vague in other situations does not help Krupenkin. *Kalt*, 145 Wis. 2d at 510-11. "Even where the outermost edges of a [policy] may be imprecise," a litigant "has no standing to attack the [policy] as vague and void on its face" if the litigant's "conduct falls within the 'hard core' of the proscriptions." *Id.* at 510-11. And here, based on the findings of fact, Krupenkin's conduct falls squarely within the "hard core" of the invention-disclosure policy. Therefore, he cannot save his vagueness challenge by asserting that other applications of the policy might, at times, be unclear.

¶49 Krupenkin also seems to be arguing that he did not violate the invention-disclosure policy. As he did during Ahlquist's investigation and then during the factfinding hearing, Krupenkin maintains that his inventions were not discovered while he was pursuing his university duties, and were instead conceived on his own time and separate from his work for the university. He takes issue with the Committee's reliance on Ahlquist's investigation because, he asserts, Ahlquist's conclusions were based on an overreliance on the "conceptual overlaps" between his university work and inventions, and on Ahlquist's assumption that Krupenkin could not "distinctly separate his thinking on his research topics into personal and academic realms."

¶50 It is not clear that this argument could support a vagueness challenge to the invention-disclosure policy—it instead appears to be an attempt to attack the Faculty Committee's findings of fact. In any event, whatever issues Krupenkin has with Ahlquist's investigative conclusions, we will "not substitute" our judgment for that of the Faculty Committee "as to the weight of the evidence on any disputed finding of fact." *See* WIS. STAT. § 227.57(6). Here, the Committee credited Ahlquist's investigative conclusions and did not credit Krupenkin's

version of events. That is, the Committee did not believe that these inventions were unrelated to Krupenkin's university work or that Krupenkin discovered these inventions on his own time independent of his university work. Under these circumstances, where "reasonable minds could arrive at the conclusion reached by [the Committee]," we defer to their conclusions. *See **Milwaukee Symphony Orchestra, Inc. v. DOR***, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674.

¶51 For all these reasons, we reject Krupenkin's argument that the invention-disclosure policy is unconstitutionally vague as applied to him.

## CONCLUSION

¶52 We conclude that Krupenkin's constitutional due process rights were not violated, and we affirm the circuit court's order.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

23